# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY
# NEWARK VICINAGE

|  |  |
|---|---|
| | ) |
| | ) Hon. Madeline Cox Arleo |
| | ) Hon. Magistrate Leda D. Wettre |
| UNITED STATES OF AMERICA, | ) |
| | ) Civil Action No. 2:22-cv-07326 (MCA-LDW) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) **SMALL PARTIES GROUP** |
| ALDEN LEEDS, INC., *et al.*, | ) **SETTLING DEFENDANTS' BRIEF** |
| | ) **IN SUPPORT OF UNITED STATES** |
| Defendants. | ) **OF AMERICA'S MOTION TO** |
| | ) **ENTER CONSENT DECREE** |
| | ) |
| | ) |

US 175834053v1

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................ iii

INTRODUCTION ...............................................................................................1

BACKGROUND ..................................................................................................6

    I.     EPA Listed the DASS on the National Priorities List in 1984 Due Primarily to TCDD Dioxin and Other Contaminants From OxyChem's Facility ..............................................7

    II.    EPA's Extensive Site Investigation and Remedy Selection (1986–2021) ......................................................10

    III.   Spill Act Litigation (2005–2013) .........................................................15

    IV.   EPA-Sponsored Allocation (2017–2020) ............................................17

    V.    *Occidental Chemical Corp v. 21st Century Fox et al.* (2018–Present) ......................................................................................23

    VI.   Post-Allocation Settlement Discussions (2021–2023)........................25

    VII.  OxyChem Comments and United States Review ..............................25

ARGUMENT ......................................................................................................26

    I.     The Settlement is Fair, Reasonable, and Consistent with CERCLA....................................29

    II.    SPG Settling Defendants Agreed to Settle in Exchange for Certainty and Finality ....................................41

CONCLUSION ...................................................................................................45

US 175834053v1

# TABLE OF AUTHORITIES

## CASES

*Action Mfg. Co., Inc. v. Simon Wrecking Co.*, 428 F. Supp. 2d 288 (E.D. Pa. 2006).................................................................................35

*Barton Solvents, Inc. v. Sw. Petro-Chem, Inc.*, 834 F. Supp. 342 (D. Kan. 1993)..45

*Caldwell Trucking PRP Grp. v. Pullman Co.*, No. 95-1690, 2002 U.S. Dist. LEXIS 28410 (D.N.J. Nov. 21, 2002) ........................................................35

*City of Bangor v. Citizens Commc'ns Co.*, 532 F.3d 70 (1st Cir. 2008) .................42

*Cranbury Brick Yard, LLC v. United States*, 943 F.3d 701 (3d Cir. 2019).......42, 44

*Diamond Shamrock Chems. Co. v. Aetna Cas. & Sur. Co.*, 609 A.2d 440 (N.J. Super. Ct. App. Div. 1992) .............................................................. 10, 36-37

*Diamond Shamrock Chems. Co. v. Aetna Cas. & Sur. Co.*, No. C-3939-84 (N.J. Super. Ct. Ch. Div. Apr. 12, 1989) ......................................................... 10, 36-37

*Env't Transp. Sys., Inc. v. ENSCO, Inc.*, 969 F.2d 503 (7th Cir. 1992) .................32

*Home Builders Ass'ns of N. Cal. v. Norton*, 293 F. Supp. 2d 1 (D.D.C. 2002) ......29

*In re Acushnet River & New Bedford Harbor Proc. re Alleged PCB Pollution*, 712 F. Supp. 1019 (D. Mass. 1989) ..........................................................................27

*In re Maxus Energy Corp.*, No. 16-11501 (D. Del.)................................................16

*In re Tutu Water Wells CERCLA Litig.*, 326 F.3d 201 (3d Cir. 2003) .............*passim*

*Kelley v. Thomas Solvent Co.*, 717 F. Supp. 507 (W.D. Mich. 1989)............... 42-43

*Litgo N.J., Inc. v. Martin*, No. 06-2891, 2010 WL 2400388 (D.N.J. June 10, 2010) ............................................................................................................35

*Litgo N.J. Inc. v. Comm'r N.J. Dept. of Env't Prot.*, 725 F.3d 369 (3d Cir. 2013) ........................................................................................................19, 21

*N.J. Dept. of Env't Prot. v. Am. Thermoplastics Corp.*, No. 98-CV-4781, 2017 WL 498710 (D.N.J. Feb. 7, 2017) ........................................................................32

*N.J. Dep't of Env't Prot. v. Occidental Chem. Corp.*, No. L9868-05 (N.J. Super. Ct. Law. Div.) ................................................................................................15

iii

*Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112 (2d Cir. 2010) ...................................................................................................................19, 20

*Transtech Indus., Inc. v. A & Z Septic Clean*, 798 F. Supp. 1079 (D.N.J. 1992)....44

*Turtle Island Restoration Network v. U.S. Dept. of Com.*, 834 F. Supp. 2d 1004 (D. Haw. 2011)........................................................................................................29

*United States v. Acton Corp.*, 733 F. Supp. 869 (D.N.J. 1990) ............................28

*United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409 (6th Cir. 1991) ..........27

*United States v. Bliss*, 133 F.R.D. 559 (E.D. Mo. 1990)........................................43

*United States v. BP Amoco Oil PLC*, 277 F.3d 1012 (8th Cir. 2002) ...............19, 42

*United States v. Cannons Eng'g Corp.*, 899 F.2d 79 (1st Cir. 1990) ..............*passim*

*United States v. Charles George Trucking, Inc.*, 34 F.3d 1081 (1st Cir. 1994) ...................................................................................................................30, 31

*United States v. Charter Intern. Oil Co.*, 83 F.3d 510 (1st Cir. 1996) ..............39, 40

*United States v. Cornell-Dubilier Elecs., Inc.*, No. 12-5407, 2014 WL 4978635 (D.N.J. Oct. 2, 2014)....................................................................................*passim*

*United States v. Davis*, 261 F.3d 1 (1st Cir. 2001) ...........................................31, 42

*United States v. Davis*, 31 F. Supp. 45 (D.R.I. 1998)........................................19, 20

*United States v. DiBiase*, 45 F.3d 541 (1st Cir. 1995)..............................................44

*United States v. Kramer*, 953 F. Supp. 592 (D.N.J. 1997) ......................................35

*United States v. Kramer*, 19 F. Supp. 2d 273 (D.N.J. 1998) ...........................*passim*

*United States v. Mallinckrodt, Inc.*, No. 4:02-cv-01488, 2006 WL 3331220 (E.D. Mo. Nov. 15, 2006)................................................................................................42

*United States v. Nat'l R.R. Passenger Corp.*, No. 86-1094, 1999 WL 199659 (E.D. Pa. Apr. 6, 1999) ................................................................................................30, 33

*United States v. Occidental Chem. Corp.*, 200 F.3d 143 (D.N.J. 1999)..................44

*United States v. Rohm & Haas Co.*, 721 F. Supp. 666 (D.N.J. 1989)..............*passim*

iv

*United States v. Se. Pa. Transp. Auth. ("SEPTA")*, 235 F.3d 817 (3d Cir. 2000) ......................................................................................................*passim*

*United States v. IMC E. Corp.*, 627 F.Supp.3d 166 (E.D. NY 2022)................30, 39

*United States v. NCR Corp.*, No. 10-C-910, 2017 WL 3668771 (E.D. Wis. Aug. 22, 2017) ...........................................................................................................32

*United States v. Wyeth Holdings LLC*, No. 15-7153, 2015 WL 7862724 (D.N.J. Dec. 3, 2015) ...........................................................................................30

*United Techs. Corp. v. Browning-Ferris Indus., Inc.*, 33 F.3d 96 (1st Cir. 1994) ..42

## STATUTES

5 U.S.C.A. § 551-599.................................................................................29

42 U.S.C.A. §§ 9601-9675.............................................................................1

42 U.S.C.A. § 9613 ....................................................................... 29, 41-42

42 U.S.C.A. § 9622 ...................................................................................41

## RULES AND REGULATIONS

Amendment to National Oil and Hazardous Substance Contingency Plan, National Priorities List, 49 Fed. Reg. 37070 (Sept. 21, 1984) (codified at 40 C.F.R. Part 300) ..........................................................................................................7

Notice of Lodging of Proposed Consent Decree Under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 87 Fed. Reg. 78710 (Dec. 22, 2022), as amended by 88 Fed. Reg. 2133 (Jan. 12, 2023) ..........................................................................................................25

## OTHER AUTHORITY

N.J. Exec. Order No. 40 (June 2, 1983) .........................................................7

NJDEP Admin. Order EO-40-17 (Oct. 19, 1983) ..............................................7

NJDEP Admin. Order EO-40-1 (June 1, 1983) .................................................7

U.S.E.P.A., *Developing Allocations Among Potentially Responsible Parties for the Costs of Superfund Site Cleanups* (Superfund Admin. Improvements Proj. Oct. 1994) ...................................................................................................18, 19

US 175834053v1

## INTRODUCTION

The Court should enter the modified Consent Decree ("CD") between the United States and eighty-two Settling Defendants, including the Small Parties Group ("SPG") Settling Defendants. The forty years that the United States Environmental Protection Agency ("EPA") spent evaluating dioxin and other contaminants in the seventeen-mile Lower Passaic River ("River" or "Site")[1] along with six years of arm's-length negotiation, aided by an ADR neutral's recommendation, has resulted in a settlement that is unquestionably fair, reasonable, and consistent with the purposes of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C.A. §§ 9601-9675.

After decades of examination, EPA concluded that the Settling Defendants collectively bear a minor share of responsibility for Site contamination. Nevertheless, these parties agreed to a significant settlement payment of $150 million, on top of the $157 million they previously contributed to Site work, not because they believe the settlement amount reflects their actual share of responsibility, but because CERCLA contribution litigation with this many parties is exorbitantly costly and time-consuming. Rather than engage in a protracted legal

---

[1] The settlement addresses EPA's claims related to two Operable Units ("OU2" and "OU4") of the Diamond Alkali Superfund Site ("DASS"), encompassing the Lower Passaic River, which runs from Newark Bay to Dundee Dam. OU2 comprises the lower 8.3 miles of the River, and OU4 comprises the entire seventeen miles of the River, including OU2. Declaration of Alice Yeh, ECF No. 288-5 ("Yeh Decl.") ¶ 6.

US 175834053v1

battle, the SPG Settling Defendants chose to pursue finality and certainty on legal issues that have been contested for far too long.  Occidental Chemical Corporation ("OxyChem")—the party with legal responsibility for the former Diamond Alkali Agent Orange manufacturing facility (the "Facility") that spent decades illegally discharging a highly toxic form of dioxin known as 2,3,7,8 tetrachlorodibenzo-*p*-dioxin ("TCDD dioxin") directly to the River—is in no position to object to this settlement.

When EPA added the DASS to the National Priorities List in 1984, it did so primarily because of TCDD dioxin from OxyChem's Facility.  Four decades of investigation and remedial work have confirmed OxyChem's primary and overwhelming responsibility for the contamination of the River.  OxyChem's predecessors contributed almost all of the most toxic contaminant found in the River, TCDD dioxin, as well as massive amounts of DDT and measurable amounts of all other EPA-designated contaminants of concern ("Contaminants").

In contrast, Settling Defendants' negligible responsibility for the Contaminants in the River makes sense considering the context of their contributions.  Unlike OxyChem, which directly discharged TCDD dioxin and other Contaminants to the River for decades (long after it was illegal to do so), many Settling Defendants sent their process/waste water of much lower toxicity to municipal sewer systems.  That process/waste water could enter the River

2

episodically only when significant rainfall and other events caused the sewers to overflow into the River.[2]   These eighty-two Settling Defendants collectively represent a small fraction (around 2%) of the thousands of parties that sent waste to these systems, many of which are not viable (financially or otherwise), no longer exist, or could not be located.[3]  As a result, Settling Defendants' collective share of the mass of Contaminants in the River and their corresponding shares of responsibility for its cleanup are extremely small.

These findings were supported by two prior court actions: (1) litigation between OxyChem and its insurer in which a court found that OxyChem acted egregiously, even by the standards of the 1940s and 1950s, leading to extensive contamination to the River from the Facility, and (2) an enforcement action by the State of New Jersey, resulting in a court-approved settlement by which OxyChem and its indemnitors paid about 90% of the States' claimed damages.  Rather than bring an enforcement action against OxyChem or issue an order requiring it to perform the Site cleanup, EPA hired an ADR neutral (the "Allocator") and convened an allocation process (the "Allocation") to help evaluate the relative responsibility of each potentially responsible party ("PRP") for Site contamination.  OxyChem

---

[2] *See* Yeh Decl., ECF No. 288-5 ¶¶ 33, 45.a.

[3] Gayle Schlea Koch, *Contributions of Contaminants of Concern (COCs) to the Passaic River* § 8 (May 22, 2020), ECF No. 289-19.

US 175834053v1

refused to participate in the process, despite efforts by EPA to encourage it to do so. Instead, OxyChem brought a CERCLA contribution suit against over one hundred parties.

Meanwhile, EPA decided to move forward with the ADR settlement process with over eighty parties willing to discuss settlement. Using an EPA-approved methodology, applying traditional allocation principles used by courts, and accommodating OxyChem by independently reviewing material and calculations for the Facility,[4] the Allocation produced an eminently reasonable outcome: the Allocator concluded that OxyChem, the party that intentionally disposed of the most highly toxic Contaminant in the River, bears overwhelming responsibility for its cleanup. Indeed, the Allocator found that Settling Defendants' collective share of responsibility for River cleanup costs is less than 1%.[5]

EPA did not simply accept and apply the Allocator's findings in crafting its settlement demand. Instead, the United States applied its own judgment and built in a significant premium and margin of conservatism into its $150 million settlement demand by (1) allocating the mass of each Contaminant contributed by the thousands

---

[4] *See* Yeh Decl. ¶ 40.

[5] *See* Allocation Operations Spreadsheet, ECF No. 289-8 (reporting the Allocator's calculation of .01% responsibility to Settling Defendants, which equates to approximately $226,000 of the $1.89 billion in Site costs); *see* Memorandum in Support of United States of America's Motion to Enter Consent Decree, ECF No. 288-1 ("U.S. Br.") at 37-38.

US 175834053v1

of non-allocation parties who no longer exist or could not be located among Allocation parties who discharged the same Contaminant (versus distributing those shares on a *pro rata* basis according to each Allocation party's responsibility, which is most common); (2) removing from consideration culpability and lack of cooperation, two commonly used allocation factors, thereby ignoring conduct by OxyChem that two New Jersey courts have found to be highly egregious; and (3) adding a 100% premium to the settlement amount.[6]    Together, these settlement-related adjustments increased the settlement to $150 million, several orders of magnitude above Settling Defendants' allocated share of 0.01%.

Although OxyChem has launched an unprecedented attack on the settlement (including filing over 800 pages of comments and full-page ads in the Washington Post), most of the issues it raises are purely legal and have already been rejected by courts across the country.  By making the well-worn CERCLA settlement process and this settlement amount even more robust than those at other sites, EPA has ensured that this settlement is procedurally and substantively fair.  No matter the effort, OxyChem cannot undermine the fairness and reasonableness of a settlement at a Site where it is overwhelmingly responsible for the Contaminants driving the need for a remedy and given that it chose not to participate in the settlement process it now criticizes.

---

[6] *See* U.S. Br. at 19-23.

US 175834053v1

This Court should enter this settlement because it is fair, reasonable, and consistent with CERCLA.

## BACKGROUND

The United States' history with the Site spans over forty years, as the United States chronicled in its Motion to Enter and accompanying declarations by Alice Yeh and Michael Sivak. *See generally* Yeh Decl.; Declaration of Michael Sivak, ECF No. 288-7 ("Sivak Decl."). This section provides a summary of key time periods and facts that underscore the fairness of the settlement:

1. TCDD dioxin accounts for the vast majority of the risk at this Site and drives the need for and nature of the cleanup;[7]

2. OxyChem is responsible for almost all of the mass of TCDD dioxin in the River as well as significant amounts of DDT and measurable amounts of all other Contaminants;[8]

3. Settling Defendants, who represent only a small fraction (less than 2%) of the parties that contributed Contaminants to the River, are responsible for only a minor share of the Contaminants,[9] and their exposure is largely the result of sending waste water to municipal sewer systems, which led to episodic contributions due to sewer overflows to the River during significant rainfall and other events; and

4. Settling Defendants have agreed to pay orders of magnitude more than any reasonable calculation of their potential contributions would dictate,

---

[7] *See* Sivak Decl. ¶ 43; Yeh Decl. ¶ 16.

[8] *See* Memorandum in Support of United States of America's Motion to Enter Consent Decree, ECF No. 288-1 ("U.S. Br.") at 13; Declaration of Christopher Wittenbrink, ECF No. 288-8 ("Wittenbrink Decl.") ¶ 37; *infra* at 8-10.

[9] *See* Yeh Decl. ¶ 54; Koch (2020) § 8, *supra* n.3.

US 175834053v1

including the EPA-sponsored Allocation conducted by a third-party neutral.[10]

## I. EPA Listed the DASS on the National Priorities List in 1984 Due Primarily to TCDD Dioxin and Other Contaminants From OxyChem's Facility.

In 1984, EPA listed the DASS as a Superfund site on the National Priorities List due to TCDD dioxin discharges from the Facility operated by OxyChem's corporate predecessors at 80/120 Lister Avenue, adjacent to the River.[11] *See* Amendment to National Oil and Hazardous Substance Contingency Plan, National Priorities List, 49 Fed. Reg. 37070 (Sept. 21, 1984) (codified at 40 C.F.R. Part 300). The listing followed the discovery of TCDD dioxin contamination at and around the Facility (including in River sediments), a resulting emergency declaration issued by the Governor of New Jersey, and fishing advisories for the River. *See* N.J. Exec. Order No. 40 (June 2, 1983); NJDEP Admin. Orders EO-40-17 (Oct. 19, 1983), EO-40-1 (June 1, 1983).[12]

---

[10] *See* Yeh Decl. ¶¶ 57-59; *infra* Argument Part I.

[11] As a matter of law, OxyChem is the corporate successor to the entity that owned and operated the Facility and is therefore liable for all contamination from the Facility. The Court made this determination in OxyChem's private litigation against over one hundred parties. *Occidental Chem. Corp. v. 21st Century Fox Am.*, No. 2:18-cv-11273 (D.N.J.) ("*21st Century Fox*").

[12] www.nj.gov/dep/passaicdocs/regdocs.html.

US 175834053v1

The risk to human health and the environment in the River, and thus the need for remediation, is overwhelmingly driven by TCDD dioxin discharged illegally from the Facility. As the United States explained,

> Like all Superfund sites, the [DASS] is defined by the areal extent of contamination, so while the Diamond Alkali facility was the first to be addressed, EPA investigated how the contamination spread to the Lower Passaic River and Newark Bay. The geographic extent of the [DASS] and the cleanup are defined by the presence of dioxin and other contaminants of concern ("COCs") released from the Diamond Alkali facility that was operated by OxyChem's predecessor. *It is not a given that in the absence of the Diamond Alkali operations and releases, the Lower Passaic River, on its own, would have been listed on the [National Priorities List of Superfund sites] or if so, what remedial action would be appropriate.*

Sivak Decl. ¶ 11 (emphasis added) (footnote omitted). Among other Contaminants, the Facility produced and discharged virtually all of the TCDD dioxin in the River. OxyChem Facility Computation Sheets, ECF No. 289-15, at ARR2575-87; OxyChem Facility Data Report, ECF No. 289-6 ("OxyChem FDR") at ARR1422-1444, 1451-1564, ARR1481; Allocation Operations Spreadsheet; Michael Bock Decl. ¶ 63, ECF No. 288-12, (OxyChem's expert confirming OxyChem's direct discharges of TCDD dioxin in concentrations and volume that would account for all of the TCDD dioxin that EPA identified in the River). TCDD dioxin is the most toxic form of dioxin and one of the most toxic substances known to exist. *See* Sivak Decl. ¶¶ 48-50; Linda S. Birnbaum, Report, ECF No. 288-10 ("Birnbaum Rep.") at 2-3; EPA, Record of Decision: Lower 8.3 Miles of the Lower

8

Passaic River Part of the Diamond Alkali Superfund Site (Mar. 3, 2016) ("2016 ROD") §§ 2.1, 5.2, 7.[13] TCDD dioxin causes cancer and other adverse health effects at extremely low levels and is the chemical against which the toxicity of all other dioxins and dioxin-like chemicals are measured. *See* Sivak Decl. ¶¶ 36, 48-49; Birnbaum Rep. 2-9.

In addition to contributing virtually all of the dioxin to the River, OxyChem contributed to each of the other seven Contaminants identified by EPA. *See* OxyChem Facility Computation Sheets at ARR2575-77; OxyChem FDR, at ARR1470. The Facility was contaminated by numerous hazardous substances, including TCDD dioxin, DDT and other herbicides and pesticides, semi-volatile compounds, and volatile organic compounds. EPA, Fifth Five-year Review Report for Diamond Alkali Superfund Site at 4 (Dec. 22, 2020).[14] Metals, including copper, lead, and mercury, were also detected in Facility soils. *Id.* EPA, Record of Decision, Diamond Shamrock Superfund Site Remedial Alternative Selection for the Properties Located at 80 and 120 Lister Avenue, City of Newark, Essex County, New Jersey (Sept. 30, 1987) ("1987 ROD") at App. B.[15]

---

[13] semspub.epa.gov/work/02/396055.pdf.

[14] semspub.epa.gov/work/02/616053.pdf.

[15] semspub.epa.gov/src/document/02/83052.

US 175834053v1

Unlike other parties, OxyChem refused to send its waste to the PVSC or a municipal system. Instead, to save money, OxyChem intentionally and illegally discharged TCDD dioxin, DDT, and other Contaminants directly from the Facility to the River long after it was illegal to do so. *See Diamond Shamrock Chems. Co. v. Aetna Cas. & Sur. Co.* ("*Aetna I*"), No. C-3939-84, at 8-12, 32-34 (N.J. Super. Ct. Ch. Div. Apr. 12, 1989);[16] *Diamond Shamrock Chems. Co. v. Aetna Cas. & Sur. Co.* ("*Aetna II*"), 609 A.2d 440, 446-49, 454-55, 461-64 (N.J. Super. Ct. App. Div. 1992) (concluding there was no insurance coverage for OxyChem's intentional contamination of the River). Hazardous substances also reached the River from the Facility through groundwater migration and stormwater runoff. 1987 ROD at 23. TCDD dioxin and other Contaminants from the Facility spread throughout the River and beyond. 2016 ROD §§ 4.2, 5.3; Declaration of Allen Medine, ECF No. 288-9 ¶¶ 24-25.

## II.      EPA's Extensive Site Investigation and Remedy Selection (1986–2021)

In the forty years between the listing of the DASS on the National Priorities List and the lodging of the CD, the United States extensively investigated and studied the Facility and the River. Early sampling showed that Contaminants, including TCDD dioxin, had migrated from the Facility into the River. Yeh Decl. ¶ 6. In the early 1990s, EPA set out to investigate a six-mile stretch of the River but

---

[16] nj.gov/dep/passaicdocs/docs/SummaryJudgment/Exhibits/Exhibit15.pdf.

expanded that investigation to the full River when it became clear that TCDD dioxin from the Facility had spread throughout the River. Yeh Decl. ¶ 9. Often at the request of OxyChem or its indemnitors, EPA simultaneously sought to identify facilities other than OxyChem's that released or potentially released hazardous substances to the River. U.S. Br. at 13. EPA then entered into settlement agreements with PRPs, including most of the Settling Defendants, to fund and eventually perform the Remedial Investigation and Feasibility Study ("RI/FS") for the full seventeen-mile stretch of the River. Yeh Decl. ¶¶ 10-11; U.S. Br. at 8; *infra* nn.18-19. EPA's years of work at the Site have yielded volumes of scientific and technical information that EPA has made available to the public, which support that OxyChem is primarily and overwhelmingly responsible for the contamination of the River. *See* Yeh Decl. ¶¶ 6, 8, 15, 22.

Based on years of knowledge accumulated from its studies and investigations, EPA selected a remedy in OU2 and an interim remedy in OU4 that primarily focused on addressing the risk presented by TCDD dioxin. On March 13, 2016, EPA issued the 2016 ROD, selecting a remedy for OU2, the lower 8.3 miles of the River. The selected remedy focuses on achieving remediation goals by addressing risk to human health primarily from one Contaminant: TCDD dioxin. *See* Yeh Decl. ¶ 16; 2016 ROD §§ 4.2, 8, 10.1, 12.13, 12.16. The chosen remedy calls for bank-to-bank dredging and removal of several feet or more of sediments to allow for capping of

11

the riverbed of the entire 8.3 miles of OU2.  2016 ROD § 12.  EPA concluded that, based on the human health and ecological risk assessments, TCDD dioxin and similar chemicals are responsible for as much as 81% to 94% of the risks relative to other Contaminants.  Yeh Decl. ¶ 16.  On September 28, 2021, EPA issued a ROD selecting an interim remedy for the upper nine miles of the River.  Yeh Decl. ¶ 17. The interim remedy targets TCDD dioxin contamination through selective dredging and capping remedies where fine-grained sediments occur in the upper nine miles of OU4.  EPA, Record of Decision for an Interim Remedy in the Upper 9 Miles of the Lower Passaic River Study Area, OU4 of the Diamond Alkali Superfund Site (Sept. 28, 2021) §§ 8, 12.[17]  Thus, the remediation that EPA selected for both OU2 and OU4 are driven by the TCDD dioxin contamination discharged from the Facility to the River.

As a result of several remedial activities, the SPG Settling Defendants previously collectively spent more than $157 million in response costs for the Site, including:

$11.03 million   to fund EPA's work on the RI/FS for the River pursuant to a 2004 settlement agreement[18]

---

[17] semspub.epa.gov/work/02/630399.pdf.

[18] Administrative Settlement Agreement, CERCLA Docket No. 02-2004-2011 (Apr. 6, 2004), semspub.epa.gov/src/document/02/99861.

| + $108.5 million | to complete the RI/FS for the River pursuant to a 2007 settlement agreement[19] |
| + $22.4 million | to remediate a mudflat at River Mile 10.9 pursuant to a 2012 settlement agreement[20] |
| + $9.5 million | tied to the cleanup of OU2 and OU4, including but not limited to legal fees; administrative costs; costs of investigation, planning, and technical support; and other indirect costs for work that has significantly benefited the River cleanup effort |
| + $5.9 million | paid by two subsets of Settling Defendants (the "2018 Settlement Agreement Parties" and the "2021 Settlement Agreement Parties," as those terms are defined in the CD, ECF No. 283, ¶ 5) that already settled their alleged CERCLA liability as to OU2.[21] |

= $157.3 million

In contrast, in the decades since it was identified as the primarily responsible party at the Site,[22] OxyChem has delayed, deflected, and denied responsibility.  In

---

[19] Administrative Settlement Agreement and Order on Consent for Remedial Investigation/Feasibility Study, CERCLA Docket No. 02-2007-2009 (May 8, 2007), semspub.epa.gov/src/document/02/99864.

[20] Administrative Settlement Agreement and Order on Consent for Removal Action, CERCLA Docket No. 02-2012-2015 (June 18, 2012), semspub.epa.gov/src/document/02/232657.

[21] Administrative Settlement Agreement, CERCLA Docket No. 02-2017-2023 (Nov. 14, 2017), semspub.epa.gov/src/document/02/518131; Administrative Settlement Agreement, CERCLA Docket No. 02-2020-2013 (Apr. 22, 2020), semspub.epa.gov/src/document/02/591178.  The 2018 and 2021 Settlement Agreement Parties are parties to the CD only as to OU4 response costs. *See* U.S. Br. at 8 n.2; CD ¶ 6.

[22] In 1984, the NJDEP ordered OxyChem's predecessor to "undertake, entirely at its own expense, a comprehensive evaluation of the site . . . to determine levels of dioxin and other chemicals at the site." *In re Diamond Shamrock Chems. Co.*, NJDEP

13

2012, the United States ordered OxyChem to help perform or fund remediation of TCDD dioxin contamination at River Mile 10.9.[23]  Unilateral Administrative Order for Removal Response Activities, CERCLA Docket No. 02-2012-2020 (June 25, 2012), OxyChem refused to participate in the remediation.  Instead, other parties, including many SPG Settling Defendants, performed this work.  *Supra* n.20. Meanwhile, OxyChem and its indemnitors devoted their resources to identifying minor PRPs at the Site and persuading EPA to investigate them.  *See* Yeh Decl. ¶ 14.

In 2016, EPA requested that OxyChem alone perform the remedial design work in OU2, and in 2023, EPA ordered OxyChem to perform the remedial design work in OU4.  *See* Yeh Decl. ¶ 23; Unilateral Administrative Order For Remedial Design, CERCLA Docket No. 02-2023-2011, ¶ 42 (Mar. 2, 2023);[24] U.S. Br. at 15 n.6.  EPA's enforcement efforts and focus on OxyChem underscore EPA's long-held view that OxyChem is the primary responsible party for Contamination in the River and that OxyChem should therefore perform the remedial actions required at the Site.

---

Administrative    Consent    Order    (Mar.    13,    1984), www.nj.gov/dep/passaicdocs/docs/SummaryJudgment/Exhibits/Exhibit10.pdf; *see also In re Diamond Shamrock Chems. Co.*, NJDEP Administrative Consent Order (Dec.    21,    1984),    www.nj.gov/dep/passaicadrec2/docs/oversight/ 19841221ACOBetween NJDEPandDSCC.pdf.  EPA also identified OxyChem as a "major" PRP at the Site.  Yeh Decl. ¶ 22.

[23] In total, OxyChem claims to have spent less than $100 million on Site costs.

[24] semspub.epa.gov/work/02/642227.pdf.

## III.    Spill Act Litigation (2005–2013)

The State of New Jersey sued OxyChem for violating New Jersey's Spill Compensation and Control Act (the "Spill Act") and other laws based on OxyChem's discharge of TCDD dioxin and other Contaminants from the Facility. *See New Jersey Dep't of Env't Prot. v. Occidental Chem. Corp.*, No. L9868-05 (N.J. Super. Ct. Law Div.) (the "Spill Act Litigation") Compl. & Jury Demand for Trial by Jury (Dec. 13, 2005).[25]  OxyChem's indemnitors filed third-party claims against hundreds of other parties, including private parties, municipalities, and the PVSC. *See* Spill Act Litigation, Defs. Maxus Energy Corp.'s and Tierra Solutions, Inc.'s Third Party Compl. "A" (Against Public Entities) (Feb. 4, 2009) & Maxus Energy Corp.'s and Tierra Solutions, Inc.'s Third-Party Compl. "B to "D" (Feb. 4, 2009).[26]

In 2011, the Spill Act Litigation court determined as a matter of law that OxyChem is the corporate successor to the entity that owned and operated the Facility and is liable for all costs incurred by the New Jersey Department of Environmental Protection ("NJDEP") associated with discharges of hazardous substances at and from the Facility.  Spill Act Litigation, Order Partially Granting Pl.s' Mot. for Partial Summ. J. Against Occidental Chem. Corp., Maxus Energy

---

[25] nj.gov/dep/passaicdocs/njdepoccpleadings.html.

[26] nj.gov/dep/passaicdocs/njdepoccpleadings.html.

15

Corp. and Tierra Solutions, Inc. (July 19, 2011);[27] ECF Nos. 951-28 at 244:7-11, 1105 at 4 in *21st Century Fox*; *see* U.S. Br. at 12.

Notwithstanding this liability determination, OxyChem was the last party to settle with the State of New Jersey.  Spill Act Litigation, Consent J. and Order on the Entry and Approval of the Consent J. (Dec. 16, 2014), ECF Nos. 951-30, 951-31 in *21st Century Fox*.  In settling, OxyChem and its indemnitors ultimately agreed to bear nearly $320 million (90%) of the $355 million in total environmental damages recovered by the State in a court-approved settlement.[28]  *See* Spill Act Litigation, Consent Judgment (Dec. 12, 2013), Third-Party Defendant Dismissal Order (Dec. 12, 2013).[29]  The Spill Act Litigation settlement, and OxyChem's decision not to challenge the amount paid by the third-party defendants, confirmed that OxyChem bore the lion's share of liability for Contamination in the River.

---

[27] nj.gov/dep/passaicdocs/njdepoccorders.html.

[28] Shortly after the Spill Act Litigation concluded, OxyChem's indemnitors, Maxus Energy Corp. and Tierra Solutions, Inc., declared bankruptcy, leaving OxyChem as the sole remaining party with legal responsibility for the Facility.  That bankruptcy proceeding is *In re Maxus Energy Corp.*, No. 16-11501 (D. Del.).  *See* ECF Nos. 1460 at Art. I.A.145 (Amended Chapter 11 Plan of Liquidation Proposed by Maxus Energy Corp.), 2721 (Liquidating Trustee's Notice of Interim Distribution Under Am. Chapter 11 Plan of Liquidation) (notifying the Court of the distribution of 66.7% of OxyChem's approximately $510 million Allowed Class 4 Claim). As the sole party with responsibility for the Facility, OxyChem has received over $340 million for these specific environmental liabilities from its indemnitors' bankruptcy proceeding.

[29] www.nj.gov/dep/passaicadrec3/njdepvocc.html.

16

## IV.    EPA-Sponsored Allocation (2017–2020)

On September 18, 2017, EPA invited more than eighty parties (the "Allocation Parties") to participate in an allocation and settlement process. Yeh Decl. ¶ 28. OxyChem was invited to participate, but it refused to do so despite significant individual outreach efforts by EPA. U.S. Br. at 2-3, 15, 38, 45; Yeh Decl. ¶¶ 34, 36-37; Responsiveness Summary, ECF No. 288-4 ("RS"), 27, 36, 77; List of Participating Allocation Parties, ECF No. 289-3. The parties that participated in the Allocation spent almost four years engaged in a robust, carefully structured, information-based allocation process.

The Allocation was conducted by an experienced team of professionals according to a detailed procedural protocol and using an EPA-approved methodology that acknowledged and appropriately weighed the different risks to human health and the environment posed by each Contaminant at the Site. *See* U.S. Br. at 16-19; Yeh Decl. ¶¶ 16-17, 40-49; *see generally* Diamond Alkali Superfund Site OU2 Allocation Protocol, ECF No. 289-3 ("Allocation Protocol"); Diamond Alkali Superfund Site OU2 Allocation Guide (June 15, 2018, as amended July 6, 2018, and Mar. 22, 2019), ECF No. 289-2, §§ 7.1, 7.6; *see also* Letter from Eric Wilson, EPA, to Allocation Parties (Feb. 16, 2018), ECF No. 289-1, at n.3 ("The relative toxicity of the [Contaminants] involved is a factor for the allocator to consider.").

17

US 175834053v1

The Allocation's methodology as provided in the Allocation Protocol (the "Protocol Method") determined the Allocation Parties' relative shares of responsibility for Site costs[30] according to well-established legal and scientific principles.  It used the Gore factors, a six-factor analytical framework that allocators and courts routinely use to evaluate the "relevant criteria" for apportioning response costs among PRPs.[31]  EPA, *Developing Allocations Among Potentially Responsible Parties for the Costs of Superfund Site Cleanups* 6 (Superfund Admin. Improvements Proj. Oct. 1994) ("*Developing Allocations*").[32]  Those factors are:

1.  "The ability of the party to demonstrate that his contribution to the release can be distinguished";

2.  "The amount of the hazardous waste involved";

3.  "The degree of toxicity of the hazardous substance involved";

4.  "The degree of involvement of the person in the manufacture, treatment, transport, or disposal of the hazardous substance";

5.  "[T]he degree of care exercised by the parties with respect to the hazardous waste concerned taking into account the characteristic of such"; and

---

[30] The Allocation team allocated shares to all parties invited to participate in the Allocation, whether they participated or not. Thus, OxyChem's relative share of responsibility was determined though it declined to participate.

[31] The Gore factors stem from an amendment proposed by then-Representative Al Gore in 1980, which was not enacted.  H.R. Rep. No. 99-253, pt. 3, at 19 (1985); *see* John C. Butler III et al., *Allocating Superfund Costs: Cleaning Up the Controversy*, 23 Env't. L. Rep. 10133, 10134-35 (1993).

[32]    epa.gov/enforcement/developing-allocations-among-potentially-responsible-parties-costs-superfund-site.

US 175834053v1

6. "The degree of cooperation between the person and the Federal, State, or local government in prevent harm to public health or the environment from . . . a release," including "efforts to mitigate damage after a release occurs."

*Niagara Mohawk Power Corp. v. Chevron USA, Inc.*, 596 F.3d 112, 130 (2d Cir. 2010) (quoting S. Rep. No. 96-848, at 345-46 (1980)); *United States v. Davis*, 31 F. Supp. 45, 63 (D.R.I. 1998).

The Gore factors have historically served as EPA and the judiciary's own guideline in allocating liability in CERCLA contribution actions and in evaluating the fairness of proposed settlements. *Developing Allocations* at 6; *see Litgo N.J. Inc. v. Comm'r N.J. Dep't of Env't Prot.*, 725 F.3d 369, 387-88 (3d Cir. 2013); *United States v. BP Amoco Oil PLC*, 277 F.3d 1012, 1016 n.3, 1021 (8th Cir. 2002).

The Allocation properly considered commonly used Gore factors such as the degree of toxicity; the amount of waste involved (that is, the Contaminants contributed by each party to the River); the Allocation Parties' degree of care (culpability); and their cooperation with regulators. Wittenbrink Decl. ¶¶ 14-16; RS 46.

For its calculation of toxicity and risk, the Protocol Method used a Relative Risk Number (weighting) for dioxin of 84%, consistent with EPA's human health and ecological risk assessments, which concluded that "dioxins/furans are responsible for as much as 81% to 94% of the risks, relative to the risks the other [Contaminants] pose." Yeh Decl. ¶¶ 16, 49. The Allocation also considered

19

culpability and cooperation as adjustment factors to be applied after each party's contribution to the mass of Contaminants was identified.[33]  Allocation Report at 32-34; Culpability & Cooperation Factors Worksheet, ECF No. 289-19 ("Culpability & Cooperation Worksheet").  The culpability factor reflects "[t]he degree of care exercised with respect to the hazardous waste concerned," and the cooperation factor regards "[t]he degree of cooperation between the person and the Federal, State, or local government in preventing harm to public health or the environment." *Niagara Mohawk Power Corp.*, 596 F.3d at 130; *Davis*, 31 F. Supp. at 63.  In Step 5.a of the methodology, the Allocator considered and assigned each Allocation Party a culpability factor based on its "release or discharge of [Contaminants] in contravention of prevailing industrial standards and practices," thereby addressing the "degree of care exercised" in the fifth Gore factor.  Allocation Report at 32-33; *see* Culpability & Cooperation Worksheet; Allocation Protocol at 7-8.  In Step 5.b, each Allocation Party was assigned a cooperation factor to address "the level to which the Allocation Party cooperated or failed to cooperate with federal and state authorities in addressing the contamination of OU2," in accordance

---

[33]  By treating culpability and cooperation as adjustment factors rather than stand-alone factors (which could, by themselves, result in significant shares of responsibility), the methodology effectively reduced OxyChem's allocated share. *See* Diamond Alkali Superfund Site OU2 Allocation Recommendation Report (Dec. 28, 2020), ECF No. 289 ("Allocation Report") at 32-34.

20

with the sixth Gore factor.   Allocation Report at 33-34; *see* Culpability & Cooperation Worksheet; Allocation Protocol at 7.

As a final step in the methodology, the Allocator distributed among the Allocation Parties the share of the PRPs that were not Allocation Parties (the so-called "orphan share").[34]  Allocation Report at 28-29; Allocation Share Relative Ranking and Allocation Tier Designations, ECF No. 289-19 ("Allocation Ranking"); Allocation Operations Spreadsheet.

The Allocation Protocol established an extensive, rigorous process for gathering and evaluating relevant information.  Although OxyChem refused to participate in the Allocation, the Allocator considered materials supplied by OxyChem regarding the contributions of participating Allocation Parties, as well as company documents, written submissions, and an extensive array of other pertinent information supplied by the participating Allocation Parties.  Yeh Decl. ¶¶ 34, 36-42. Each participating Allocation Party was required to certify the completeness of its responses to information requests by the Allocator, and the United States' covenant not to sue in the CD is expressly conditioned on the veracity and completeness of information provided to EPA and the Allocator.  RS 82; CD ¶¶ 14, 27.  The Allocator

---

[34] The Allocation's use of "orphan share" differs somewhat from the traditional definition of "orphan share," which is the share of PRPs who cannot be assigned "an ideal measure of monetary responsibility" because, for example those PRPs are "immune from suit, bankrupt, or defunct."  *Litgo N.J., Inc.*, 725 F.3d at 380 n.4 (quotation marks omitted).

US 175834053v1

considered the information provided and issued summaries with respect to each participating party. Yeh Decl. ¶ 40. Each participating Allocation Party then had the opportunity to review and comment on those summaries. Yeh Decl. ¶ 40.

This process culminated in the Allocation Report issued in December 2020, which ranked the relative responsibility of all Allocation Parties. Allocation Ranking. The Allocation Report grouped PRPs into five tiers based on their level of responsibility, with OxyChem alone occupying the first tier. U.S. Br. at 19; Allocation Ranking. Applying the EPA-approved allocation methodology to the extensive information reviewed in the Allocation, the Allocator determined that OxyChem's share of responsibility for Site cleanup is 99.94%. Allocation Ranking. This conclusion was largely a result of the fact that OxyChem contributed virtually all of the most toxic Contaminant—TCDD dioxin—to the Site through its highly culpable conduct. *See* OxyChem Facility Computation Sheets, at ARR2575-87; Allocation Report at 20-23; *supra* Background Part I.

In contrast, the Allocation concluded that all other parties at the Site are minor; their responsibility is a fraction of one percent. Allocation Ranking; Allocation Operations Spreadsheet; Yeh Decl. ¶ 54 ("[T]he Settling Defendants, individually and collectively, are responsible for a minor share of response costs . . . ."). This was largely due to the type and amount of Contaminants they contributed to the River.

US 175834053v1

In addition to the Protocol results, the Allocation Report provided calculations under an alternative method that had not been approved in advance by EPA or the participating Allocation Parties (the "Alternative Method"). Yeh Decl. ¶ 45.b.ii. The primary difference between the methods is that the Alternative Method did not use the traditional approach of allocating the orphan share on a *pro rata* basis according to relative responsibility; instead, it attributed to the parties known to have contributed some mass of each Contaminant the shares of non-Allocation Parties also responsible for that Contaminant. *See* Yeh Decl. ¶ 45.b.ii. For example, the unallocated mass of PCBs was attributed only to those Allocation Parties that had purportedly discharged PCBs to the River, as opposed to attributing that mass to all Allocation Parties on a *pro rata* basis consistent with controlling case law and the Allocation Protocol. The Alternative Method results in a much higher share of responsibility for Settling Defendants and a much lower share for OxyChem, that is, 92% to OxyChem (a reduction of more than 7.9%). Allocation Ranking; Yeh Decl. ¶ 57.a.

## V.    *Occidental Chemical Corp. v. 21st Century Fox et al.* (2018–Present)

Rather than participating in the Allocation, OxyChem chose to initiate costly litigation. On June 30, 2018, while the Allocation was ongoing, OxyChem filed suit against over one hundred parties under Sections 107 and 113 of CERCLA to recover

23

costs allegedly incurred at the Site.  ECF No. 1 in *21st Century Fox*; *see* Yeh Decl. ¶ 36.

From 2018 through 2022, the parties in that case engaged in highly burdensome and contentious discovery, including the exchange of extensive documents and numerous depositions of individual parties by OxyChem.  The Court stayed *21st Century Fox* on March 1, 2023, to focus on consideration of the settlement in this matter.  ECF No. 2287 in *21st Century Fox*.  On March 24, 2023, OxyChem filed additional CERCLA claims against a subset of the *21st Century Fox* defendants in *Occidental Chemical Corp. v. Givaudan Fragrances Corp.*, No. 2:23-cv-01699 (D.N.J.) ("*Givaudan*").  ECF No. 1 in *Givaudan*.  On January 5, 2024, the Court stayed both cases pending the adjudication of the motion to enter the CD in this action.  ECF No. 2351 in *21st Century Fox*; ECF No. 149 in *Givaudan*. OxyChem's actions were an attempted end-run around the CERCLA process and siphoned time and resources from the cleanup of the River, which OxyChem has already avoided for over forty years.  They also imposed a time-consuming and expensive litigation cost burden on the Settling Defendants, which have chosen to pay hundreds of times their fair share to settle with EPA and extinguish (through contribution protection) OxyChem's vexatious litigation claims.

24

## VI.    Post-Allocation Settlement Discussions (2021–2023)

For approximately eighteen months following the issuance of the Allocation Report, the United States evaluated the Allocation findings and negotiated with Settling Defendants and their counsel.  Yeh Decl. ¶ 57.  As the basis for its negotiating position, the United States utilized the Alternative Method and disregarded the culpability and cooperation adjustments made by the Allocator.  Yeh Dec. ¶¶ 57, 59.  This was a conservative approach that increased the settlement payments of minor parties beyond their Allocation shares, thus benefitting OxyChem.  *See* U.S. Br. at 19-21; Yeh Decl. ¶ 57.  Using either the Protocol Method or the Alternative Method, the collective share of Settling Defendants is extremely small—only in the hundreds of thousands of dollars.  The Settling Defendants nevertheless agreed to fund the aggregate settlement amount in the amount of $150 million and successfully negotiated the CD with the United States.

## VII.    OxyChem Comments and United States Review

In December 2022, the United States lodged a proposed CD, ECF No. 2-1, and posted it for a public comment period of ninety days.  Notice of Lodging of Proposed Consent Decree Under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 87 Fed. Reg. 78710 (Dec. 22, 2022), as amended by 88 Fed. Reg. 2133 (Jan. 12, 2023); *see* ECF No. 34-1 at 21-22 (requesting that the United States extend the comment period).  In addition to nearly

eight hundred pages of comments, including legal and technical arguments and twelve expert reports, OxyChem submitted nearly twenty-four thousand pages of supporting exhibits to the United States.[35] ECF Nos. 238 at 2, 240, 249 at 1-2, 288-3 ¶ 14; RS at 1. Over the course of several months, the United States carefully considered those and other comments received. *See* ECF Nos. 238 at 2, 248 at 5:20-25; RS at 1 & n.1; *see generally* ECF No. 288-3.

In response to public comments,[36] the United States modified the CD by (1) adding a reopener clause to account for potential cost overruns at the Site and (2) removing three parties from the settlement. ECF Nos. 283, 288 to 288-1; *see* ECF No. 272. The United States lodged the modified CD on January 17, 2024, ECF No. 276, and moved for its entry on January 31, 2024, ECF Nos. 288 to 288-1 (including three declarations and two expert reports supporting entry of the CD).

## <u>ARGUMENT</u>

SPG Settling Defendants agree with the United States that the CD meets all applicable standards for approval and join the United States in requesting entry of the CD.

---

[35] In addition to its public comments, OxyChem burdened the United States with an inordinate number of Freedom of Information Act requests. *See* ECF No. 251 at 1.

[36] The modifications to the CD were directly responsive to OxyChem's public comments. *See* RS 89; ECF No. 288-11 at 3, 22, 24, 43, 49, 116, 133, 152.

On a motion to enter, "[a] court should approve a [CD] if it is fair, reasonable, and consistent with CERCLA's goals." *In re Tutu Water Wells CERCLA Litig.*, 326 F.3d 201, 207 (3d. Cir. 2003); *accord United States v. Cornell-Dubilier Elecs., Inc.*, No. 12-5407, 2014 WL 4978635, at *3 (D.N.J. Oct. 3, 2014).  In reviewing a proposed CD according to this standard, the Court does not consider the merits of the underlying dispute and does not itself calculate shares of responsibility.[37]  *In re Acushnet River & New Bedford Harbor Proc. Re Alleged PCB Pollution*, 712 F. Supp. 1019, 1028 (D. Mass. 1989); *see United States v. Kramer*, 19 F. Supp. 2d 273, 281 (D.N.J. 1998) ("[T]he court does not have the duty to reconstruct the settlement process and review the allocated shares with mathematical exactitude by delving into the data and reports upon which the settling parties based their negotiations."); *United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1424 (6th Cir. 1991) ("Ours should not be the task of engaging in a de novo review of the scientific evidence . . . .  The federal courts have neither the time nor the expertise to do so, and CERCLA has properly left the scientific decisions regarding toxic substance cleanup to the President's delegatee, the EPA administrator and his staff.").  The Court also need not determine that the settlement is the ideal outcome, that the basis

---

[37] For these reasons, the Court also need not consider or resolve the plethora of arguments on the merits that OxyChem will no doubt raise regarding the Allocation or settlement calculations, nor is any additional procedure—including discovery and an evidentiary hearing—necessary. *See* U.S. Br. at 45-46 (explaining that CERCLA discourages a trial on the merits of the decisions supporting settlement).

27

of the settlement is error-free, or that the settlement represents what the Court itself might have fashioned. *See In re Tutu Water Wells*, 326 F.3d at 208-09; *United States v. Se. Penn. Transp. Auth.* ("*SEPTA*"), 235 F.3d 817, 824 (3d Cir. 2000); *Kramer*, 19 F. Supp. 2d at 280-82.

Rather, the Court's task "is to determine whether the settlement represents a reasonable compromise, all the while bearing in mind the law's generally favorable disposition toward the voluntary settlement of litigation and CERCLA's specific preference for such resolution." *United States v. Acton Corp.*, 733 F. Supp. 869, 871-72 (D.N.J. 1990) (quotation marks omitted); *United States v. Cannons Eng'g Corp.*, 720 F. Supp. 1027, 1035 (D. Mass. 1989) ("The presumption in favor of settlement is particularly strong where a [CD] has been negotiated by the Department of Justice on behalf of a federal administrative agency specially equipped, trained, or oriented in the field." (alteration and quotation marks omitted)).

In particular, the substantive fairness prong of the CD approval standard requires the terms of a CD to be "based on comparative fault and apportion liability according to rational estimates of the harm each party caused." *In re Tutu Water Wells*, 326 F.3d at 207 (quotation marks omitted); *see United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 87 (1st Cir. 1990). When, as here, the comparative fault determination of a CERCLA settlement is based in part on an underlying allocation, the Court need only determine that the underlying allocation "on which the

28

settlement terms are based is not arbitrary, capricious, and devoid of a rational basis."[38]  *SEPTA*, 235 F.3d at 824 (quotation marks omitted); *see In re Tutu Water Wells*, 326 F.3d at 207; *Cannons Eng'g Corp.*, 899 F.2d at 87.  "Due to the imprecise nature of this evaluation, the court should normally defer to the agency's expertise so long as the figures relied upon derive in a sensible way from a plausible interpretation of the record."  *Cornell-Dubilier Elecs.,* 2014 WL 4978635, at *10 (quotation marks omitted).

## I.    The Settlement is Fair, Reasonable, and Consistent with CERCLA.

In its motion to enter, the United States explained how the CD meets the above standard for approval by disclosing its calculations and rationale for the settlement terms.  *See* U.S. Br. at 17-23.  SPG Settling Defendants agree with the United States that the CD meets all standards for approval.

The CD is procedurally fair.  It is the result of lengthy, good faith, arm's-length negotiation based on the exchange of extensive underlying information between sophisticated parties with adverse interests that were represented by

---

[38] This arbitrary and capricious inquiry applies only to the underlying measure of comparative fault, not to the CD itself.  Indeed, the "arbitrary and capricious" standards in Section 113(j)(2) of CERCLA, 42 U.S.C.A. § 9613(j)(2), and the Administrative Procedure Act (APA), 5 U.S.C.A. §§ 551-559, have no place in a CD proceeding because a proposed CD is neither a "response action" within the meaning of Section 113(j) nor is it a final agency action subject to judicial review, *see Home Builders Ass'ns of N. Cal. v. Norton*, 293 F. Supp. 2d 1, 5 (D.D.C. 2002); *Turtle Island Restoration Network v. U.S. Dep't of Com.*, 834 F. Supp. 2d 1004, 1011 (D. Haw. 2011).

US 175834053v1

experienced counsel and advised by expert consultants—all factors that courts routinely conclude guarantee the procedural fairness of a settlement. *See Cannons Eng'g Corp.*, 899 F.2d at 84, 87; *United States v. Charles George Trucking*, 34 F.3d 1081, 1081 (1st Cir. 1994); *United States v. IMC E. Corp.*, 627 F. Supp. 3d 166, 172-74 (E.D.N.Y. 2022); *In re Tutu Water Wells*, 326 F.3d at 207; *United States v. Wyeth Holdings LLC*, No. 15-7153, 2015 WL 7862724, at *2 (D.N.J. Dec. 3, 2015); *United States v. Nat'l R.R. Passenger Corp.*, No. 86-1094, 1999 WL 199659, at *9 (E.D. Pa. Apr. 6, 1999); *Kramer*, 19 F. Supp. 2d at 284; *United States v. Rohm & Haas Co.*, 721 F. Supp. 666, 675 (D.N.J. 1989). Moreover, OxyChem was invited to participate in the Allocation yet declined to do so, vitiating the force of any OxyChem criticism of the process leading to the settlement.[39] *See In re Tutu Water Wells*, 326 F.3d at 207-08 (stating that parties challenging a settlement bear a heavy burden when they fail to participate and allege after the fact that they bear disproportionate liability); *Cannons Eng'g*, 899 F.2d at 86 (concluding that appellants knew they "could spurn the EPA's proposal only at the risk of paying more at a later time"). The United States' approach of identifying minor parties with which to settle separately from its pursuit of a far more significant Contaminant contributor like OxyChem is a valid and established procedure for funding cleanups,

---

[39] OxyChem provided dossiers on Allocation Parties to EPA that were provided to the Allocation team.

30

*see Cannon's Eng'g*, 899 F.2d at 85-86, and is consistent with NJDEP's decision to settle with the third parties in the Spill Act Litigation, *see supra* Background Part III.

When the procedural fairness factor has been satisfied, there is also a presumption of substantive fairness. *Rohm & Haas Co.*, 721 F. Supp. at 681; *Kramer*, 19 F. Supp. 2d at 285; *see United States v. Davis*, 261 F.3d 1, 23 (1st Cir. 2001) (discussing a procedural fairness finding as a "proxy for substantive fairness"); *Charles George Trucking*, 34 F.3d at 1089 ("[S]ubstantive fairness flow[s] as a natural consequence from procedural fairness. . . . [T]hat one type of fairness serves to assure the other . . . is precisely the function of procedural fairness.").

Even in the absence of that presumption, however, the CD is substantively fair because it is "based upon, and roughly correlated with, some acceptable measure of comparative fault." *Cannons Eng'g Corp.*, 899 F.2d at 87; *see In re Tutu Water Wells*, 326 F.3d at 207 ("As long as the measure of comparative fault on which the settlement terms are based is not arbitrary, capricious, and devoid of a rational basis, the district court should uphold it." (quotation marks omitted)); *SEPTA*, 235 F.3d at 824 (same); *Rohm & Haas Co.*, 721 F. Supp. at 687 ("Where a money settlement is shown to bear a reasonable relation to some plausible estimate, or range of estimates . . . CERCLA requires that such a settlement be accepted and entered as a [CD].").

31

The United States explained that the settlement amount is "based on" the Alternative Method, with additional adjustments to further enhance the recovery against Settling Defendants. *See* U.S. Br. at 32. Indeed, in many prior matters, courts have agreed that an EPA-sponsored, EPA-conducted, or private allocation underlying a settlement constitutes an "acceptable measure of comparative fault" that fulfills the substantive fairness factor. *See, e.g.*, *Cannons Eng'g Corp.*, 899 F.2d at 87; *accord Kramer*, 19 F. Supp. 2d at 285; *New Jersey Dep't of Env't Prot. v. Am. Thermoplastics Corp.*, No. 98-CV-4781, 2017 WL 498710, at *1 (D.N.J. Feb. 7, 2017) (referring to the "confidential ADR process [that] lasted from 1996 to 2001 to address cleanup liabilities from the site, ending in a global settlement of the Combe Fill South litigation in 2009"). There is no single way to allocate responsibility at Superfund sites. The EPA-approved Protocol Method represents a reasonable allocation approach using traditional Gore factors.[40] Because the underlying Allocation is a "rational basis for determining comparative fault," which is all that

---

[40] Although the Gore factors may be weighted differently depending on site-specific circumstances, *see Env't Transp. Sys. v. ENSCO, Inc.*, 969 F.2d 503, 509 (7th Cir. 1992), all six factors are reliable aspects of a standard allocation, and, in some instances, culpability and cooperation are the key factors, *see United States v. NCR Corp.*, No. 10-C-910, 2017 WL 3668771, at *8 (E.D. Wisc. 2017) (discussing the additional weight placed on the culpability factor in a prior government allocation of costs).

US 175834053v1

precedent requires, the CD satisfies the substantive fairness requirement. *SEPTA*, 235 F.3d at 824.

The CD also fulfills the reasonableness component of the approval standard. *See Cannons Eng'g Corp.*, 899 F.2d at 89-90. Factors taken into account in this analysis include "the amount of monetary compensation to the public . . . and the overall fairness of the decree in light of the relative strength of the parties and foreseeable risks of loss." *Nat'l R.R. Passenger Corp.*, 1999 WL 199659, at *14. "Deference is given to the efforts of the EPA and [DOJ], and their expert determination that the proposed decree is in the public interest." *Id.* at *15.

In this case, Settling Defendants have agreed to pay hundreds of times more than their fair share of Site costs in exchange for the finality of settlement. By extracting a settlement figure that is orders of magnitude greater than the Settling Defendants' allocated share of responsibility and by adding a reopener for cost overruns, EPA has ensured that the public will be more than adequately compensated for actual and anticipated future costs at the Site. *See* CD ¶ 15(f); Yeh Decl. ¶¶ 57, 59.

In any CERCLA matter, the United States seeks the full value of Site costs from all of the Site PRPs. *See Cornell-Dubilier Elecs.*, 2014 WL 4978635, at *9-10. If the full amount of Site costs is regarded as a pie, a determination that a group of PRPs is paying its fair share of costs is based on a comparison of two calculations:

how much of the pie the PRP group is responsible for (as determined in an allocation) and how much of the pie the PRP group is actually paying. Here, based upon the Allocator's recommendation under the EPA-approved Protocol Method, the Settling Defendants are paying hundreds of times (600 times) their allocated fair share.

That substantial overpayment derives from the United States' post-Allocation settlement demands, which formed the final basis of the total settlement payment. Those calculations rest on a series of conservative adjustments that significantly overestimated SPG Settling Defendants' allocated responsibility for Site costs and significantly underestimated that of OxyChem. *See* U.S. Br. at 19-20, 23, 32; Yeh Decl. ¶ 57.[41]

Using the Allocation as the "starting point" for settlement negotiations, the United States first premised its settlement calculations on the relative shares of responsibility the Allocator assigned under the Alternative Method rather than the Protocol Method. Yeh Decl. ¶ 57.a. According to the Protocol Method, OxyChem is responsible for 99.94% of Site costs, including 99.94% of the orphan share, and

---

[41] That the United States and SPG Settling Defendants approached the settlement differently is one indication of the arm's-length and adversarial nature of the negotiations between them—key factors in analyzing procedural fairness. *See Kramer*, 19 F. Supp. 2d at 284 (concluding that a settlement was procedurally fair where the settlement parties' "interests throughout the process were generally adverse to each other," creating an "arm's length check-and-balance through informed advocacy by knowledgeable counsel").

34

Settling Defendants, collectively, are responsible for only 0.011971% of Site costs.[42]

Allocation Operations Spreadsheet.

The allocation of 99% responsibility to OxyChem according to the Protocol Method is consistent with the *Aetna I* and *Aetna II* findings of OxyChem's egregious conduct (assigning OxyChem all liability for contamination as between it and its insurer due to intentional acts) and OxyChem's payment of 90% of the NJDEP's costs to clean up the River in the Spill Act Litigation settlement. *See supra* Background Part III. Moreover, the Settling Defendants are minor parties in large part because they collectively contributed a relatively small amount of lower-toxicity Contaminants to the River, if any at all. EPA's evaluation over the last forty years,

---

[42] The EPA-approved Protocol Method comports with court precedent on orphan share redistribution. *See, e.g.*, *United States v. Kramer*, 953 F. Supp. 592, 598 (D.N.J. 1997) ("It appears much more equitable to apportion the orphan shares to all the [PRPs]according to their relative equitable share (alteration and quotation marks omitted)); *Action Mfg. Co. v. Simon Wrecking Co.*, 428 F. Supp. 2d 288, 329 (E.D. Pa. 2006) ("Because the size of the orphan share is indeterminate, the fairest way to divide it is . . . to allocate the entire [amount] between the CSDG and the Simon Entities, in proportion to their relative liability at the Site."); *Caldwell Trucking PRP Grp. v. Pullman Co.*, No. 95-1690, 2002 U.S. Dist. LEXIS 28410, at *81 (D.N.J. Nov. 21, 2002) ("Equity demands that all of the parties bear proportionate responsibility for any 'orphan share.' . . . The Court holds that any calculated orphan share should be apportioned *pro rata* according to the parties' allocation shares of liability."); *Litgo N.J., Inc. v. Martin*, No. 06-2891, 2010 WL 2400388, at *36-40 (D.N.J. June 10, 2010) (allocating orphan shares *pro rata* based on parties' relative equitable shares at a site contaminated with TCE, PCE, and other hazardous substances after considering Gore factors).

35

the Allocation results, and the Spill Act Litigation settlement all support this conclusion.

Nevertheless, the United States' settlement demand was based upon the Alternative Method, which shifts to the minor Allocation Parties the responsibility for all of the shares of the non-Allocation Parties. According to that method, OxyChem is responsible for 92.94% of Site costs, and the Settling Defendants are collectively responsible for 1.95%. Allocation Operations Spreadsheet; Yeh Decl. ¶ 57.a. Therefore, this settlement approach by the United States increased its settlement demand of the Settling Defendants above the Protocol Method. If applied to OxyChem, it would reduce its payment amount by about 7%.

Additionally, the United States arrived at its settlement number by removing any consideration of the culpability and cooperation factors assigned in the Allocation. U.S. Br. at 19-21; RS 71. This was a particularly generous concession to OxyChem, at the expense of all other parties. OxyChem's culpable conduct in causing Contaminant releases at the Site is well-documented and notorious. "[E]ven by the standards of the 1951-1969 time period, [OxyChem's] conduct in operating the Newark plant was unacceptably wrong and irresponsible." *Aetna I*, No.-C-3939--84, at 11. Although it knew that dioxin was hazardous, OxyChem "made a conscious decision" not to reduce or eliminate dioxin production at the Facility because "[p]rofits came first." *Aetna II*, 609 A.2d at 462.

36

In the 1950s and 1960s, OxyChem "knowingly and routinely discharged contaminants over a period of 18 years" from the Facility to the River, including direct discharges of TCDD dioxin and DDT. *Aetna II*, 609 A.2d at 461; *see id*. at 448, 454-55 (discussing OxyChem's "heedless indifference to the environmental damage" caused by its intentional discharges); *Aetna I*, No. C-3939-84, at 9. Its "waste disposal policy . . . essentially amounted to 'dumping everything' into the Passaic River." *Aetna II*, 609 A.2d at 447-48; *see Aetna I*, No. C-3939-84, at 9-10. TCDD dioxin and other Contaminants also reached the River as a result of appallingly sloppy housekeeping practices at the Facility. *Aetna I*, No. C-3939-84, at 9-10. OxyChem "deliberately concealed" its illegal discharges, including by using "an alarm system to warn employees to stop the discharges when Passaic Valley inspectors were on the premises," *Aetna I*, No. C-3939-84, at 9, and by directing employees "to surreptitiously wade into the river at low tide and 'chop up' ['mountains' of DDT] so that they would not be seen by passing boats." *Aetna II*, 609 A.2d at 448.

The Allocator appropriately considered the prior court findings and evidence regarding OxyChem's highly culpable conduct and its lack of cooperation. OxyChem Facility Computation Sheets at ARR2586 (assigning a 100% culpability score to OxyChem); OxyChem FDR at ARR 1446-64. Ignoring these Gore factors in negotiations with the Settling Defendants increased the United States' settlement

37

US 175834053v1

demand to Settling Defendants up to 3.88%.  Yeh Decl. ¶ 57.  Applying the same approach would reduce OxyChem's contribution under the Alternative Method from 92.94% to 85.07%.[43]  *See* Yeh Decl. ¶ 57.

The United States then applied an additional amount to account for potential cost overruns (the "premium").[44]  U.S. Br. at 22.  Applying a premium protects the United States against uncertainties as to future response costs in exchange for a discharge of liability, contribution protection, and the certainty of a final resolution.

---

[43] OxyChem also benefited from other aspects of the Allocation.  The Allocator estimated the mass of Contaminants discharged from each facility through three flow pathways: overland flow (i.e., runoff), direct discharge, or the sewer system.  Assumptions made in the calculation of this pathway tended to overestimate discharge via overland flow, for many facilities, the primary contribution of Contaminant mass to the River, as determined by the Allocator, was via overland flow.  *See, e.g.*, Allocation Report at 22 (noting that maximum concentrations were used for calculation of the overland flow pathway).

In contrast, as to OxyChem, for which the Allocator identified significant evidence of direct discharges to the River, the Allocator applied *average* concentrations of Contaminants like dioxin and DDx.  *See* Allocation Report at 20 (for direct discharge pathways, "where multiple concentrations of a [Contaminant] in wastewater were found in the data documents, an average of those concentrations was calculated").  As a result, OxyChem's ultimate share—which was largely driven by direct discharges and average Contaminant concentrations rather than overland flow and maximum concentrations—was lower relative to parties with facilities with more acreage that received larger overland flow calculations due to the use of maximum concentrations.  On a relative basis, these methodologies reduced OxyChem's share and increased the shares of other Allocation Parties.

[44] Even the United States' calculation of Settling Defendants' collective responsibility under the Alternative Method favors OxyChem by including in the 3.88% the share of several non-settling parties.  Allocation Operations Spreadsheet; U.S. Br. at 22.  Furthermore, although the modified CD involves three fewer Settling Defendants, the settlement amount was not reduced.  ECF Nos. 272, 283.

US 175834053v1

*See Rohm & Haas Co.*, 721 F. Supp. at 688 n.25; *IMC E. Corp.*, 627 F. Supp. 3d at 176; *see also United States v. Charter Int'l Oil Co.*, 83 F.3d 510, 522 n.17 (1st Cir. 1996) ("An early cash-out settlement may sometimes require the settling party to pay a premium for the risks the government bears out of the uncertainty of the total cost of the remedy."); *Cannons Eng'g Corp.*, 899 F.2d at 89 (characterizing a premium as "the cost of purchasing peace").  The United States calculates the premium for Settling Defendants as 100%, meaning that it negotiated to recover double its estimated $1.84 billion in OU2 and OU4 remedial action costs, in addition to $50 million in EPA's past costs.  U.S. Br. at 22-23, 25; Yeh Decl. ¶¶ 56-57.

When calculated using the Protocol Method with the adjustments for culpability and cooperation, Settling Defendants' allocated share of Site responsibility is 0.011971%.  Allocation Operations Spreadsheet.  Comparing the 0.011971% share of responsibility to the $1.89 billion in Site costs means that the $150 million payment in the CD represents *more than 600 times* Settling Defendants' collective responsibility under the Protocol Method.  Moreover, if the CD is approved, the United States will have recovered from Settling Defendants $157 million in prior response costs *plus* $150 million from the settlement itself.[45]

---

[45] The CD also requires that the Settling Defendants waive all CERCLA claims or causes of action for OU2 and OU4 that they might otherwise have against any other Settling Defendant or any other third party, except in certain enumerated circumstances.  CD ¶ 20.  The CD contains a cost reopener clause to protect the public from cost overruns.  CD ¶ 15(f).

In addition to the fact that it is based on a rational estimate of comparative fault, the CD is reasonable because it will spare the government and taxpayers from expending limited government and judicial resources on burdensome, risky litigation. The reasonableness requirement is additionally satisfied because the parties "intelligently enter[ed] into" the CD and there is no "clear error of judgment" or "serious mathematical error" that would change the settlement. *Cornell-Dubilier Elecs.*, 2014 WL 4978635, at *9.

Finally, because the CD is consistent with CERCLA's goals—encouraging the expeditious cleanup of Superfund sites and ensuring that those responsible for contamination bear the costs of cleanup—this prong of the CD approval standard is satisfied.[46] *See In re Tutu Water Wells*, 326 F.3d at 207; *Cornell-Dubilier Elecs.*, 2014 WL 4978635, at *12; *Charter Int'l Oil Co.*, 83 F.3d at 522. Specifically, the CD serves CERCLA's goals by ensuring that Settling Defendants make funding available for EPA's use, including an overpayment that is many times any measure of their actual responsibility, while at the same time ensuring that the bulk of the Site costs remain to be paid by the primary PRP, OxyChem. In sum, SPG Settling Defendants agree with the United States that the CD meets all criteria for its entry.

---

[46] Indeed, the CD is likely just the first of several anticipated settlements; other participating Allocation Parties and noticed PRPs that were not included in the Allocation, such as the PVSC, are in settlement negotiations with the United States. *See* U.S. Br. at 33; RS 6.

40

US 175834053v1

**II.**      **SPG Settling Defendants Agreed to Settle in Exchange for Certainty and Finality.**

SPG Settling Defendants agreed to pay a settlement amount that is significantly greater than their actual share of Site costs in order to obtain certainty and finality as to their alleged liability for OU2 and OU4, consistent with CERCLA's incentives for settlement. The CD will resolve the Settling Defendants' liability as to OU2 and OU4 subject only to gross cost overruns that would trigger a reopener clause. *See* CD ¶¶ 15(f), 23. Under the terms of the settlement, the United States agrees "not to sue or to take administrative action against Settling Defendants under Sections 106 and 107(a) of CERCLA regarding OU2 and OU4." CD ¶ 13. Settling Defendants also receive contribution protection as to the matters addressed by the CD, which specifically include "all response actions taken or to be taken and all response costs incurred or to be incurred, at or in connection with OU2 and OU4, by the United States or any other person, except for the State." CD ¶ 23; *see* 42 U.S.C.A. § 9613(f)(2).

CERCLA promotes such settlement through contribution protection, which shields parties that settle with the government from contribution actions: "A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement." 42 U.S.C.A. § 9613(f)(2); *accord* 42 U.S.C.A. § 9622(h)(4); *see Rohm & Haas Co.*, 721 F. Supp. at 677 ("By enacting

41

§ 113(f)(2) . . . Congress has plainly indicated that non-settling defendants' contribution claims will be barred"). Contribution protection is a powerful means to effectuate the Congressional goal of encouraging settlement in CERCLA matters. *See Cannons Eng'g Corp.*, 899 F.2d at 91 ("[Contribution protection provides] a substantial benefit to settling PRPs—and a corresponding detriment to their more recalcitrant counterparts."); *Cranbury Brick Yard*, 943 F.3d at 706 ("Contribution-claim immunity under § 9613(f)(2) promotes these efficient settlements."); *BP Amoco Oil PLC*, 277 F.3d at 1021 ("[C]ontribution protection is reasonable and consistent with the underlying policies and goals of CERCLA because it prevents duplicate liability and encourages cooperation with the government, thereby serving the goals of efficient and effective environmental cleanup and regulation."); *City of Bangor v. Citizens Communications Co.*, 532 F.3d 70, 93 (1st Cir. 2008); *Davis*, 261 F.3d at 27.

As the Third Circuit has explained, "settlement carries the inherent benefit of finally resolving liability." *Cranbury Brick Yard*, 943 F.3d at 706. CERCLA, in particular, was "designed to . . . provide PRPs a measure of finality in return for their willingness to settle." *United States v. Mallinckrodt, Inc.*, No. 4:02-cv-01488, 2006 WL 3331220, at *2 (E.D. Mo. Nov. 15, 2006); *accord United Tech. Corp. v. Browning-Ferris Indus.*, 33 F.3d 96, 103 (1st Cir. 1994). Here, SPG Settling Defendants have "foregone the possibility of prevailing on the merits" in litigation

42

in exchange for the finality of settlement afforded by the contribution protection provision and covenant not to sue in the CD. *Kelley v. Thomas Solvent Co.*, 717 F. Supp. 507, 514-15 (W.D. Mich. 1989).

The United States, too, will benefit from the finality and certainty of settlement. *See id.* (explaining that the plaintiff "exchanged a right to obtain adjudicatory relief for a known recovery sum"). Were the United States to litigate its claims against Settling Defendants, that litigation would be lengthy and expensive, involving over eighty parties and consuming considerable public and private resources. *See United States v. Bliss*, 133 F.R.D. 559, 567 (E.D. Mo. 1990) ("By-passing the time and expense required by litigation is an obvious plus."); U.S. Br. at 38. That litigation would also be risky. As minor parties, SPG Settling Defendants have strong arguments that they are responsible for only a tiny fraction of Site costs. There would be no guarantee—indeed it would be highly unlikely— that the United States would recover a sum as significant as the $150 million secured by the CD. *See* U.S. Br. at 2 (discussing that the United States "maximize[d] the recovery" from Settling Defendants in the CD); Allocation Ranking (assigning an allocation share of over 99% to OxyChem).

If entered, the CD will preserve significant resources of the United States, Settling Defendants, and the public. *See Rohm & Haas Co.*, 721 F. Supp. at 685

US 175834053v1

n.23. Indeed, this Court's conclusion in a foundational CERCLA case rings just as true now as it did in 1989:

> [I]t is clear that the settlement with these . . . entities will greatly curb the transaction costs of what already promises to be a drawn out and expensive trial. This, given the limited capabilities of the public fisc to provide enforcement and judicial resources, is surely a desirable result. On the other hand, disapproval of the settlement would require the Government to engage in a long litigative expedition against these parties, with the promise of no absolute benefit . . . .

*Id.* at 694.

For the same reasons, the CD, if entered, will serve the purposes of CERCLA, which encourages settlement over burdensome litigation to ameliorate CERCLA's unforgiving liability scheme and heavy litigation burden, while promoting timely cleanup funded by responsible parties rather than the Government. Indeed, the "usual federal policy encouraging settlements is even stronger in the CERCLA context." *United States v. Occidental Chem. Corp.*, 200 F.3d 143, 150 (3d Cir. 1999) (quotation marks omitted); *accord Transtech Indus., Inc. v. A & Z Septic Clean*, 798 F. Supp. 1079, 1087 (D.N.J. 1992). That is because, by "reduc[ing] excessive litigation expenses and transaction costs," settlements "preserv[e] scarce resources for CERCLA's real goal: the expeditious cleanup of hazardous waste sites." *United States v. DiBiase*, 45 F.3d 541, 546 (1st Cir. 1995); *accord Cranbury Brick Yard*, 943 F.3d at 706; *Cornell-Dubilier Elecs.*, 2014 WL 4978635, at *3 ("[CERCLA] encourages the use of [CDs] as a means of advancing the public interest and

44

US 175834053v1

minimizing litigation."). As intended by Congress, approval of the CD will minimize "litigation-related expenditures so that more resources will be available for actual clean-up[, which] is no doubt an important goal of both CERCLA and the federal courts generally." *Barton Solvents, Inc. v. Sw. Petro-Chem, Inc.*, 834 F. Supp. 342, 345-46 (D. Kan. 1993).

## CONCLUSION

In this instance, CERCLA has operated exactly as Congress intended. After years of Allocation proceedings and arm's-length negotiation, the United States and eighty-two Settling Defendants reached an agreement for the payment of Site costs in an amount that far exceeds Settling Defendants' share of responsibility. SPG Settling Defendants entered into the CD to avoid further litigation. The Court should grant the United States' motion to enter because the settlement is fair, reasonable, and effectuates the purposes of CERCLA.

Dated: April 1, 2024          Respectfully submitted,

s/ *Jeffrey D. Talbert*
**ARNOLD & PORTER KAYE SCHOLER LLP**
One Gateway Center, Suite 1025
Newark, NJ 07102
Telephone: 973.776.1888
Jeffrey D. Talbert, Esq. (Bar # 333512021)
*Common Counsel for the Small Parties Group Defendants*

45

US 175834053v1

## CERTIFICATE OF SERVICE

I, Jeffrey D. Talbert, hereby certify that on April 1, 2024, I caused a copy of

the foregoing document to be served via electronic filing on all counsel of record.

Dated: April 1, 2024                s/ *Jeffrey D. Talbert*
                                    **ARNOLD & PORTER KAYE SCHOLER LLP**
                                    One Gateway Center, Suite 1025
                                    Newark, NJ 07102
                                    Telephone: 973.776.1888
                                    *Common Counsel for the Small Parties Group Defendants*

46

US 175834053v1