## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

**UNITED STATES OF AMERICA,**

    *Plaintiff*,

    v.

**ALDEN LEEDS, INC., et al.,**

    *Defendants*.

---

**Civil Action No. 22-07326**

**OPINION**

**ARLEO, UNITED STATES DISTRICT JUDGE**

Plaintiff United States of America (the "United States" or the "Government") asks this Court to enter a Consent Decree ("CD") resolving its claims under Sections 106, 107, and 113 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA" or the "Act"), 42 U.S.C. §§ 9606, 9607, 9613, against 82 defendants ("Settling Defendants") for their share of responsibility concerning two zones of the Diamond Alkali Superfund Site ("Site"): Operable Unit 2 ("OU2") and Operable Unit 4 ("OU4"). For the following reasons, this Court grants the United States' Motion to Enter the CD.

## I.    Background

The Diamond Alkali facility, a chemical plant located at 80–120 Lister Avenue in Newark, New Jersey, manufactured chemicals such as Agent Orange, a byproduct of which is dioxin. In 1983, the United States Environmental Protection Agency ("EPA") and the State of New Jersey ("State") sampled the former Diamond Alkali facility for dioxin in furtherance of EPA's National Dioxin Strategy. ECF No. 288-5 ("Yeh Decl.") ¶ 6. Finding high levels of the toxic substance both at and around the facility, EPA proposed the Site be added to the EPA Superfund Program's

National Priorities List.  *Id.*  The listing was finalized a year later.  *Id.*  In the meantime, the State issued an executive order to authorize emergency measures, including "securing the Lister Avenue property, covering the exposed soils to prevent migration, and addressing dioxins found on nearby properties."  *Id.* ¶ 7.  The property was guarded for 24 hours a day.  OU1 Record of Decision ("ROD") at 13.[1]

Further testing at the Diamond Alkali facility revealed that the dioxin—among other contaminants released from the facility—had migrated into the Lower Passaic River, which flows through "multiple communities with environmental justice concerns."  Yeh Decl. ¶ 6.  As a result of the migration, the Site extends far beyond the boundaries of the former Diamond Alkali facility and is instead "defined by the areal extent of contamination."  ECF No. 288-7 ("Sivak Decl.") ¶ 11.  Currently, the Site consists of four different zones, or Operable Units.  OU1 is the former Diamond Alkali facility itself, where the initial sampling was performed.  Yeh. Decl. ¶ 6.  OU2 is the lower 8.3 miles of the Lower Passaic River Study Area ("LPRSA").  *Id.*  OU3 covers the Newark Bay Study Area.  *Id.*  And, finally, OU4 consists of the entirety of the LPRSA, which encompasses the "17-mile tidal reach of the Passaic River from Newark Bay to Dundee Dam, near Garfield, New Jersey, including the lower 8.3 miles of the river."  *Id.*  As referenced above, the CD resolves Settling Defendants' liability as to OU2 and OU4, OU2 being a part of the larger OU4.  Accordingly, while the record demonstrates EPA has engaged in significant research and remediation efforts as to OU1 and OU3, *see, e.g.*, *id.* ¶¶ 7, 8; Sivak Decl. ¶ 6 n.1, the remaining background will focus on EPA-led response actions concerning OU2 and OU4.

---

[1] Available at https://semspub.epa.gov/work/02/83052.pdf.

### A. OU2

EPA's initial strategy was to "approach[] the full 17 miles of the LPRSA"—which encompasses both OU4 and OU2—"as a single study area," and it entered into agreements with a subsection of potentially responsible parties ("PRPs") to fund or perform a Remedial Investigation and Feasibility Study ("RI/FS") of the LPRSA. Yeh Decl. ¶¶ 10–11. But information gathered during the Remedial Investigation indicated that the lower 8.3 miles of the river contained "the bulk of the contaminated sediment which is the source of most of the risk associated with the Lower Passaic River." *Id.* ¶ 11. So, EPA shifted gears and undertook a targeted RI/FS of OU2 while the RI/FS for the entire LPRSA was pending. *Id.* EPA found that, "largely due to sediment transport and mixing caused by the tidal nature of the Lower Passaic River," a shocking 90% of contaminated sediments in the LPRSA were concentrated in its lower 8.3 miles. *Id.* And, because of the serious risk of contamination those sediments posed to the remainder of the LPRSA and Newark Bay, EPA elected to triage, moving forward with a final remedy for OU2 while, still, "the

comprehensive study of the 17-mile LPRSA continued." *Id.* ¶ 12.

EPA issued the OU2 ROD in March 2016, setting forth its selected remedy to address the area's severe contamination.[2]  *Id.* ¶ 16.  The complete remedy is estimated to cost $1.38 billion and, among other things, prescribes the construction of an engineered cap to "cover the [river's] bottom bank to bank."  *Id.*  In the ROD, EPA identified, in addition to dioxin, several other dangerous substances in OU2 sediments and developed a list of eight contaminants of concern ("COCs") that pose "the greatest potential risks to human health and the environment": dioxans/furans, PCBs, DDT, polycyclic aromatic hydrocarbons, dieldrin, mercury, copper, and lead.  *Id.*  Of those COCs, dioxin is, "by an overwhelming margin," the most toxic.  Sivak Decl. ¶¶ 49–50.

---

[2] The OU2 ROD is available at https://semspub.epa.gov/work/02/396055.pdf.

### B. OU4

In September 2021, in a second ROD, EPA selected an interim remedy for the upper 9 miles of OU4. Yeh Decl. ¶¶ 10, 17. The interim remedy is estimated to cost $441 million, *id.* ¶ 17, and, aligned with EPA's strategy to eliminate the most pressing threats first, will target dioxin and PCB "hot-spots" through dredging and capping to prevent further contamination of the LPRSA, ECF No. 288-6 ("Sharkey Decl.") ¶¶ 13–14 (noting that dioxin and PCBs are the "primary . . . risk drivers" in the upper nine miles of the LPRSA); ECF No. 288-1 at 10. According to EPA, "the OU4 interim remedy is intended to complement the OU2 remedy," Yeh Decl. ¶ 17, "resulting in cost efficiencies for parties conducting the remedial action," minimizing "disruption to the river ecology and [to] the many communities along the river," and "expedit[ing] recovery of the river," Sharkey Decl. ¶¶ 15–16. While the Government acknowledges that "EPA may yet require a final remedial action for OU4," ECF No. 337 at 25, EPA has included in the estimated cost of the OU4 interim remedy "long-term monitoring that will lead to a final record of decision" for the entire LPRSA, Sharkey Decl. ¶ 19.

### C. EPA Works to Assess Liability for OU2

Starting in the 1990s, EPA worked to identify facilities beyond Diamond Alkali that contributed to the Site's contamination. Yeh Decl. ¶ 14. In March 2016, soon after it issued the OU2 ROD, EPA notified over 100 parties that they are PRPs for that particular zone. *Id.* ¶ 20. And while most of those parties had already received notice letters relating to the LPRSA more broadly, some were learning of their potential liability for the first time. *Id.* The letter specified that EPA "believe[d] that some of the parties that [were] identified as PRPs under CERCLA . . . may be eligible for a cash out settlement" for OU2. Yeh Decl., Ex. A at 4.

Consistent with its letter, EPA pursued an early cashout settlement with fifteen parties who were not associated with any of the COCs identified in the OU2 ROD.[3]  *Id.* ¶ 25.  As to the remaining noticed PRPs, who "had failed several times to perform an allocation [of responsibility for OU2's contamination] themselves," *id.* ¶ 26; *id.*, Ex. B at 1, EPA decided to sponsor an allocation to "aid it in identifying parties that should perform and/or finance the OU2 cleanup"— the work parties—"and parties of responsibility so small in relation to the other PRPs that they should be eligible for a cashout," *id.* ¶ 26.

### 1.  EPA Pursues an Allocation

EPA had several goals for the allocation.  First, it would be non-binding and voluntary, *id.*, though, PRPs that failed to participate would still be evaluated and considered for a settlement, *id.*; *id.* ¶ 44.  Second, it would be streamlined to "catalyze settlements and the cleanup of the river." *Id.* ¶ 29.  Third, it would be structured so that "smaller PRPs with fewer resources [could] participate without undue burden alongside later PRPs," and so that no party retained an advantage. *Id.*

In March 2017, EPA wrote to the PRPs concerning the proposed allocation and explained that the PRPs would have a "future opportunity . . . to offer input on the factors that they think should be considered in the allocation process, and to provide feedback on the overall design of the allocation process." *Id.*, Ex. C at 2.  Later that year, EPA hosted a meeting in New York City to solicit the PRPs' views in this regard, and, while EPA had initially intended to limit participation in the allocation to PRPs who had *not* contributed dioxin or PCBs—OU2's highest risk

---

[3] EPA and the fifteen PRPs entered into the cashout settlement under CERCLA Section 122(h), 42 U.S.C. § 9622(h), which was finalized in 2018.  Yeh Decl. ¶ 25 & n.31.  These parties paid EPA $4,209,000.  *Id.* ¶ 25.

contaminants—to the zone, EPA was there persuaded to extend the allocation to all private[4] PRPs in furtherance of "transparency and fairness." *Id.* ¶¶ 27–28.

Among those parties invited to participate in the allocation was Intervenor Occidental Chemical Corporation ("OxyChem").

### 2.  OxyChem Declines to Participate in the Allocation

OxyChem has been adjudicated Diamond Alkali's corporate successor and is liable for the facility's contribution to the Site's contamination. *Occidental Chem. Corp. v. 21st Century Fox Am.*, No. 2:18-cv-11273 (D.N.J. Sept. 11, 2020), ECF No. 1105 at 4.  OxyChem does not appear to dispute that the Diamond Alkali facility—now OU1 of the Site—has a storied history of egregious waste disposal practices. *See generally Diamond Shamrock Chems. Co. v. Aetna Cas. & Sur. Co.*, 609 A.2d 440, 447–49 (N.J. Super. Ct. App. Div. 1992) (describing Diamond Alkali employees' testimony that the company's "waste disposal policy . . . amounted to 'dumping everything' into the Passaic River").  As a result of Diamond Alkali's conduct, OxyChem has been—by necessity—involved with various response efforts at the Site.

When EPA sent notice to PRPs, including OxyChem, concerning the OU2 ROD in 2016, EPA also announced its intention to ask OxyChem to perform the remedial design work for that zone. *See* Yeh Decl. ¶ 22; *id.*, Ex. A at 4 ("EPA seeks to determine whether [OxyChem] will

---

[4] Among the parties that received notice for potential OU2 liability were several municipalities, including Intervenor Passaic Valley Sewer Commission ("PVSC").  These public entities were "not invited to participate in the allocation[] and were not assigned shares of responsibility."  Yeh Decl. ¶ 33.  Instead, EPA determined that the municipalities were best suited to "contribute in-kind services" rather than funding. *Id.*  The allocation, however, incorporates an analysis of the PVSC wastewater system, as "it was relevant to the shares of many of the allocation parties." *Id.*; *see also* ECF No. 289 at 7, 20–29 (Allocation Recommendation Report indicating consideration of PVSC in calculations).

voluntarily perform the remedial design . . . for the remedy selected in the [OU2] ROD."). OxyChem entered into an agreement to perform the work under EPA supervision.[5]  *Id.* ¶ 23.  EPA separately "issued to [OxyChem] a unilateral administrative order for the remedial design of OU4," with which OxyChem noticed its intent to comply.[6]  *Id.*  And, as aforementioned, EPA also sought OxyChem's participation in the allocation.  *Id.* ¶ 27.

OxyChem attended EPA's inaugural OU2 allocation meeting in New York City, *id.*, as well as a second meeting where PRPs met EPA's chosen allocator, AlterEcho, and discussed the allocation process, *id.* ¶ 31.  While 69 of the invited PRPs agreed to participate in the allocation, OxyChem and nine others declined.  *Id.* ¶¶ 34, 44.

EPA, determined to secure OxyChem's participation, met with OxyChem approximately a week after the second meeting "to address some questions and concerns [OxyChem] had about the allocation and [to] underscore EPA's view that allocation and negotiation—not litigation—is the best approach to resolving liability for OU2."  *Id.* ¶ 36.  While it appears OxyChem took issue with several aspects of the allocation, *see id.*, Ex. H; ECF No. 309-3, Ex. 27, OxyChem claims that the "key reason" it "objected to [AlterEcho's] process" "was the lack of safeguards to prevent PRPs from selectively withholding (or misrepresenting) critical information about their own liability," ECF No. 309 at 23.  EPA followed up with a letter to OxyChem addressing this concern and others

---

[5] OxyChem notes in its briefing that it "completed the [OU2 remedial] design on schedule" and "submitted the final design report for EPA review and approval."  ECF No. 309 at 6.

[6] OxyChem contends that it "offered to implement EPA's selected remedy in OU4" and later "reiterated its offer . . . along with a proposal for a sequence of agreements through which OxyChem would implement the OU2 remedy."  ECF No. 309 at 6–7.  The United States disputes this characterization, stating that OxyChem's offer, at least as to OU2, was "nebulous and conditional, including upon the cooperation of other unidentified parties."  ECF No. 288-1 at 15 n.6; *see also* Yeh Decl. ¶ 24 ("No PRP, including [OxyChem], has made an offer to enter into a consent decree to perform the entirety of the OU2 and OU4 remedial actions.").

and explained that, by joining the allocation, OxyChem could help shape the information sharing process itself, and that EPA would "consider using its enforcement resources to supplement the information provided" by PRPs if "gaps in the information or data available to AlterEcho threaten[ed] to impede" the process. Yeh Decl., Ex. H at 3. EPA also assured that, if the allocation indicated that additional cashout settlements were warranted, it would "consider how to incorporate a suitable certification from the settling parties about the completeness of their disclosures." *Id.*

EPA's attempts to persuade OxyChem ultimately failed despite repeated requests for the company's participation, and despite EPA's endeavors to "ke[ep] OxyChem informed of [its] efforts to address participants' comments and concerns about the allocation framework." *Id.* ¶ 37.

### 3. The Allocation Proceeds

"[S]till need[ing] a strategy for addressing the large number of PRPs it considered liable" for OU2, EPA moved forward with the allocation without OxyChem. *Id.* ¶ 38.

AlterEcho's allocation was multiphasic and collaborative. *See id.* ¶ 32 (describing the several phases of allocation planning, development, and execution). PRPs were invited to "provide input on the allocation methodology, the allocation process, and the database design." *Id.* ¶ 35. In addition to shaping the process, PRPs submitted significant material for consideration during the process itself, including "factual documents . . . position briefs and responsive briefs, expert reports," and exhibits thereto "addressing their responsibility and that of the other allocation parties" to AlterEcho. *Id.* ¶ 40. EPA, upon request, increased the quantity of documents that PRPs were permitted to submit to AlterEcho for review. *Id.* Participating PRPs were not the only source of data, however. EPA itself contributed approximately "130,000 pages of factual documentation

about the noticed private parties" that it collected over the course of 40 years of investigation, including "factual material the State of New Jersey made publicly available following the settlement of its lawsuit concerning the Site," and information that OxyChem submitted to EPA concerning "80% of the PRPs."[7]  *Id.* ¶ 39.

PRPs' participation went beyond data submissions.  PRPs were permitted to review their own and other PRPs' Facility Data Reports to highlight any errors and omissions therein, as well as comment on the draft of the Allocation Recommendation Report—the final report that would summarize each PRP's relative responsibility for contaminating OU2.  *Id.* ¶ 40.

Participating PRPs were required to certify to the completeness of the information they submitted, ECF No. 289-2 at 76–77, or risked alteration of their share of liability, *id.* at 68 ("The failure of a Participating Allocation Party to participate in compliance with the [rules of the allocation] may be considered by the Allocator as a factor in determining such party's allocated share.").  But where data was simply missing, AlterEcho "applied logical inferences and assumptions based on professional judgment" and in consultation with both participating PRPs and experts.  Yeh Decl. ¶ 40.  And, for the ten parties that declined to participate (including OxyChem), AlterEcho "assigned additional resources to the allocation team to perform

---

[7] In its Responsiveness Summary ("RS"), ECF No. 288-4, EPA explains that some of the information it contributed to the allocation was previously voluntarily submitted to it by PRPs, or was drawn from "[r]esponses to EPA's information requests issued under Section 104(e) of CERCLA[.]"  RS 81.

independent reviews of allocation materials and calculations for their facilities to ensure that they were fairly evaluated in the allocation process." *Id.*

During the course of the allocation and based on information submitted to AlterEcho, EPA entered into a second cashout settlement with a group of six PRPs who demonstrated they had not contributed any COCs to OU2.[8] *Id.* ¶ 46.

Ultimately, the allocation assigned shares of responsibility for OU2 to 79 PRPs for a total of 92 facilities. *Id.* ¶ 44. To calculate a PRP's share, AlterEcho considered the following factors: (1) "[h]ow much of each COC was discharged historically by each facility;" (2) "[h]ow much of each COC is still present in the river, and who is responsible for it;" (3) "[h]ow much responsibility does each allocation facility bear for each COC;" (4) "[h]ow much harm does each facility's COCs pose to humans and the environment;" (5) "[w]as the allocation party cooperative" and how culpable are they; (6) "[d]id the allocation party have more than one facility;" (7) "[w]hat was each allocation party's final share;" and (8) "[w]here did each allocation party fall with respect to the others." *Id.* ¶ 45. Predicated on nearly 700,000 pages of supporting factual documentation, the final Allocation Recommendation Report ("Report") was issued in December 2020. *Id.* ¶¶ 47, 62.

The final report calculated PRPs' relative shares of responsibility based on two distinct methods: the "Protocol Method" and the "Alternative Method." The methods differed based on how the allocation team distributed the mass of COCs that were not attributed to one of the allocation parties, or, for purposes of this litigation, the "orphan shares." *Id.* ¶ 45 b.ii. The Protocol Method "distributed the unattributed mass of all COCs among all allocation facilities on a pro rata

---

[8] This group of PRPs, like those in 2018, *see infra* note 3, entered the cashout settlement under CERCLA Section 122(h), 42 U.S.C. ¶ 9622(h). Yeh Decl. ¶ 46 & n.55. The settlement was finalized in April 2021, and the parties paid EPA $1,964,200. *Id.* ¶ 46.

basis, based on each facility's total relative responsibility for all COCs, regardless of which COCs that facility discharged to the river." *Id.* ¶ 45 b.ii.1. The Alternative Method focused on the COCs for which a particular facility was responsible, and "distributed the unattributed mass of COCs on a COC-by-COC basis." *Id.* ¶ 45 b.ii.2. For example, a facility that did not contribute dioxin would not be distributed any of that COCs unattributed mass.

The Report, in addition to calculating each PRP's share of responsibility, endeavored to place PRPs in five allocation "tiers" based on relative responsibility. *Id.* ¶ 48. Intervenor OxyChem was placed—alone—into Tier 1. Tier 2 includes two other Intervenors in this suit, Nokia and Pharmacia. The remaining PRPs, with the exception of five PRPs who were assigned no tier or share for lack of a "nexus" between their facilities and the contamination, were placed in Tiers 3–5. *Id.*

### D. The Consent Decree

In furtherance of EPA's initial objective, *see id.*, Ex. A, Ex. C, the Government reviewed the Report to determine which PRPs were best suited to perform or finance the remedial action, and which PRPs were best suited for a cashout settlement. The Government selected PRPs from Tiers 3, 4, and 5 to participate because they, "individually and collectively, are responsible for a minor share of the response costs incurred and to be incurred at or in connection with the cleanup of OU2." *Id.* ¶ 54.

Rather than just resolve the selected PRPs' liability as to OU2, the Government extended the settlement to cover OU4. It reached this conclusion for several reasons, including that the "allocation considered releases of contaminants to the [entire LPRSA], not just [OU2]," *id.* ¶ 55, releases of "COC-contaminated sediments are . . . commingled and deposited throughout [the

entire LPRSA]" as a result of "tidal action and other forces," *id.* ¶ 13, and "the OU4 interim remedy is intended to complement the OU2 remedy," *id.* ¶ 55.  *See also* Responsiveness Summary ("RS") at 84–88 (explaining decision to extend settlement to OU4); ECF No. 288-9 (declaration of Allen Medine explaining contaminant migration throughout the LPRSA).  Accordingly, the Government included in CD negotiations the subgroups of PRPs with which it already settled as to OU2, *see infra* notes 3 & 8, so that they could also resolve their liability for OU4, Yeh Decl. ¶¶ 55, 57; *see also* ECF No. 283 ¶ 6.

The negotiations between the Government and the Settling Defendants spanned eighteen months and utilized the Report as a starting point to facilitate agreement.  Yeh Decl. ¶ 57.

### 1.  The Settlement Starts with the Report

While the Report served as the foundation for negotiations, the final agreement reflected several adjustments to the Report's non-binding recommendations.  *Id.*

As an initial matter, the Government opted to use the Alternative Method of calculating shares, which, as set forth above, distributed the non-attributed COCs on a COC-by-COC basis.

*Id.* ¶ 57.a.  This change resulted in a lower allocation share for OxyChem but an increase in responsibility for the other tiers of PRPs.  *Id.*

| Protocol Method | | Alternative Method | |
|---|---|---|---|
| Allocation Party | Allocation Share | Allocation Party | Allocation Share |
| Tier 1 (OxyChem) | 99.9396% | Tier 1 (OxyChem) | 92.9394% |
| Tier 2 | 0.0438% | Tier 2 | 5.1112% |
| Tiers 3-5 | 0.0166% | Tiers 3-5 | 1.9494% |

*Id.* ¶ 57.a (screenshot of chart included in Yeh Decl.).

Next, deeming it "subjective," the Government removed the cooperation and culpability factor from the calculations, which, again, resulted in an increase in liability for other PRPs but not for OxyChem.  *Id.* ¶ 57.b.

| Alternative Method Calculation without Cooperation/Culpability Factors | | |
|---|---|---|
| Allocation Party | Tier | Share |
| Occidental Chemical Corp. | 1 | 85.07% |
| Nokia and Pharmacia | 2 | 11.01% |
| *Tiers 1 & 2 Subtotal* | | *96.08%* |
| Tiers 3-5 (parties invited to settle only) | 3, 4 & 5 | 3.88% |

*Id.* ¶ 57.c (screenshot of chart included in Yeh Decl.).

The Government then added a 100% "premium" to the estimated OU2 and OU4 remedial design and remedial action costs—but not EPAs past costs—to "account for the fact that the remedies for OU2 and OU4 have not yet been implemented and [for] the possibility of cost

overruns." *Id.* ¶ 57.d.  Said differently, the Settling Defendants agreed to pay twice their share of remedial action costs to provide a cushion for contingencies.

Finally, the Government included in the settlement amount an additional payment of over five million dollars from Settling Defendants "in exchange for completion of an already existing administrative order on consent." *Id.* ¶ 57.e.

All considered, the Settling Defendants agreed to pay $150,000,000 to resolve their liability for OU2 and OU4 to the United States.[9]

| How the Settlement Amount Was Calculated | |
|---|---|
| OU2 & OU4 estimated costs of the remedial designs and remedial actions: | $1.84 Billion |
| (OU2 & OU4 estimated costs of the remedial designs and remedial actions) + 100% premium: | $3.68 Billion |
| EPA's past costs for OU2 & OU4: | $50 million |
| Total OU2 & OU4 costs = OU2 & OU4 estimated costs of the remedial designs and remedial actions + 100% premium + EPA's past costs for OU2 & OU4 | $3.73 Billion |
| Tiers 3-5 Combined Share: (parties invited to settle only) | 3.88% |
| Total OU2 & OU4 costs * 3.88% share: | $144,724,000 |
| (Total OU2 & OU4 costs * 3.88%) + Additional payment re. existing admin. order: | $150,000,000 |

*Id.* (screenshot of chart included in Yeh Decl.).

As just "one part of a larger enforcement effort," this settlement, memorialized in the CD, recovers approximately 8% of estimated past and future costs for OU2 and OU4.  *Id.* ¶¶ 60–61. And, when combined with significant monies recovered from other settlements and bankruptcy proceedings, the CD brings the Government's recovery to approximately 14%.  *See id.* ¶¶ 61, 64.

---

[9] Notably, the chart's calculations reflect an earlier, higher cost estimate for the OU4 interim remedy—$460 million as opposed to $441 million—meaning that Settling Defendants presumably contributed, with the premium, an approximated additional $1.4 million to the total pool of funds for the Site.  *See* Sharkey Decl. ¶ 24.

Funds from the CD, like those recovered from other EPA enforcement efforts to date, *id.* ¶ 64, will be "retained and used to conduct or finance response actions at or in connection to the Site," ECF No. 283 ¶ 8; Yeh Decl. ¶ 65 ("The availability of settlement funds will allow EPA to pay for cleanup work at the Site . . . .").

### 2. The United States Seeks Approval of the CD

In December 2022, the Government lodged the CD with this Court, ECF No. 2, and solicited public comment for a period of 90 days, ECF No. 288-3, Spohn Decl. ¶ 2 (citing 87 Fed. Reg. 78710-11, 88 Fed. Reg. 2133). The Government received 53 comments, including several from OxyChem. OxyChem's comments totaled "777 pages, with more than 24,000 pages of supporting exhibits." *Id.* ¶ 13. After considering each comment in consultation with experts over the course of a year, the Government determined that changes to the CD were in order, including the removal of certain parties from the CD, *see* ECF No. 285, and an addition of a "cost-reopener" provision ("Reopener") that permits the United States to pursue additional enforcement action against Settling Defendants if costs for OU2 and OU4 remedial action exceed a predetermined amount, ECF No. 283 ¶ 15.f.

The modified Consent Decree was filed on the docket in January 2024, ECF No. 283, along with a detailed Responsiveness Summary, ECF No. 288-4, wherein the Government provided a response to each comment received and explained the changes to the CD.

### 3. Relevant Provisions of the CD

The CD states that the "objective of the [United States and Settling Defendants] in entering into this Consent Decree is for Settling Defendants to make a cash payment to resolve their alleged civil liability under Sections 106 and 107 of CERCLA for OU2 and OU4." ECF No. 283 ¶ 6. And,

consistent with EPA's early communications concerning a potential cashout settlement, *see* Yeh Decl., Ex. A at 4 (noting that a cashout settlement "[t]ypically" includes "a covenant not to sue" and "protection from contribution claims"), the CD contains several protections for Settling Defendants.

First, the CD contains a Covenant Not to Sue ("Covenant"), which states that the "United States covenants not to sue or to take administrative action against Settling Defendants [for the facilities covered by the CD] under Sections 106 and 107(a) of CERCLA regarding OU2 and OU4." ECF No. 283 ¶ 13. The Covenant takes effect when this Court's approval of the CD is recorded on the docket (the "Effective Date"), *id.* ¶ 5, but is "conditioned on satisfactory performance by Settling Defendants of the requirements" of the CD, as well as the "veracity and completeness of the information provided to EPA and/or AlterEcho by each Settling Defendant" relating to the covered facilities, *id.* ¶ 14.

The CD also contains a provision for contribution protection ("Contribution Provision") under Section 113 of CERCLA, and states that "each Settling Defendant has, as of the Effective Date, resolved liability to the United States within the meaning of Sections 113(f)(2) and 113(f)(3)(B) of CERCLA for OU2 and OU4" and is therefore "entitled, as of the Effective Date, to protection from contribution actions or claims as provided by Section 113(f)(2) of CERCLA . . . for the 'matters addressed'" in the CD. *Id.* ¶ 23. "Matters addressed" include "all response actions taken or to be taken and all response costs incurred and to be incurred, at or in connection with OU2 and OU4, by the United States or any other person, except for the State, provided, however, that if the United States exercise[s]" any of its general reservations of rights, "the 'matters

addressed in th[e CD] will no longer include those response costs or response actions that are within the scope of the exercised reservation." *Id.*

These general reservations apply beyond just the Contribution Provision and include any or all Settling Defendants' (1) "liability for failure to meet a requirement of th[e CD];" (2) "liability arising from a Settling Defendant's past, present, or future disposal, release, or threat of release of Waste Material outside of OU2 and OU4 (including such Waste Material that migrated through OU2 and OU4);" (3) "liability based on a Settling Defendant's ownership or operation of a facility(ies)" not covered in the CD; (4) "liability based on a Settling Defendant's operation of a [covered] facility(ies) associated with it . . . when such an operation commences after such Settling Defendant's signature to th[e CD];" (5) "liability based on a Settling Defendant's transportation, treatment, storage, or disposal of Waste Material at or in connection with the Site, after signature of th[e CD] by such Settling Defendant;" (6) "liability for performance of response actions or for the reimbursement of response costs if and to the extent the total combined response costs paid by EPA and/or any other person in connection with the remedial actions for OU2 (after September 30, 2016) and OU4 (after March 2, 2023) exceed $3.68 billion, as determined by EPA based on its review of appropriate documentation;" (7) "liability for damages for injury to, destruction of, or

loss of natural resources, and for the costs of any natural resource damage assessments;" and (8) "criminal liability." *Id.* ¶ 15.

Accordingly, while the CD provides significant protections to Settling Defendants, those protections are not unlimited, and the Government retains authority to pursue Settling Defendants for additional funds or response action if any of the several reservations are invoked.

## II.    Discussion

Having filed the CD with this Court, ECF No. 283, the Government now moves for judicial approval of the agreement.  The Government submitted a detailed memorandum with declarations and exhibits in support of its motion.  *See generally* ECF Nos. 288–292.  Settling Defendants have filed an omnibus brief in support of the CD, *see* ECF No. 310, as has Intervenor Passaic Valley Sewer Commission, ECF No. 338.[10]  OxyChem, on the other hand, has intervened in opposition to approval of the CD, ECF No. 309, while two other PRPs, Nokia and Pharmacia, appear to primarily bemoan the Government's failure to settle with them on different terms, *see* ECF No. 307; ECF No. 308.[11]  This Court is persuaded that the CD is fair, reasonable, and furthers CERCLA's objectives and therefore approves it in full.

## A.  CERCLA's Legal Framework

"CERCLA provides a complex statutory scheme for the cleanup of the nation's hazardous waste sites."  *United States v. Occidental Chem. Corp.*, 200 F.3d 143, 147 (3d Cir. 1999).  And while the Act provides EPA "several alternative strategies for achieving the statute's objective,"

---

[10] Sherwin-Williams has intervened to respond to OxyChem's discussion of the company in its briefing.  ECF 339.

[11] Nokia and Pharmacia's arguments will be discussed separately from OxyChem's, *see infra* Section II.C.

*id.*, each ensures that the parties actually "responsible for problems caused by the disposal of chemical poisons bear the costs and responsibility for remedying the harmful conditions they created," *FMC Corp. v. Dept. of Com.*, 29 F.3d 833, 843 (3d Cir. 1994) (quotation marks omitted). Given its remedial purpose, CERCLA "should be construed liberally to effectuate its goals." *Id.* at 840 (quoting *United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 258 (3d Cir. 1992)).

### 1. CERCLA Provides EPA with Multiple Tools to Effectuate its Purpose

For example, if EPA determines there exists an "imminent and substantial endangerment to public health or welfare," Section 106 of CERCLA permits the agency to order PRPs to undertake remedial action "either by obtaining injunctive relief in a District Court or by issuing such administrative orders 'as may be necessary to protect public health and welfare and the environment.'" *Occidental Chem. Corp.*, 200 F.3d at 147 (quoting 42 U.S.C. § 9606(a)). Section 107, on the other hand, permits EPA to recover response costs "incurred" by the United States, 42 U.S.C. § 9607(a); *see FMC Corp.*, 29 F.3d at 835, and to seek a declaratory judgment as to PRPs' "liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages," *id.* § 9613(g)(2*); see also Santa Clarita Valley Water Agency v. Whittaker Corp.*, 99 F.4th 458, 483 (9th Cir. 2024) (explaining how § 9607 and § 9613(g)(2) work together).

But litigation and administrative orders are not the only means of enforcement available to EPA. The agency can also settle with PRPs to resolve their liability under the aforementioned Sections. *See* 42 U.S.C. § 9622(a) (providing affirmative grant of settlement authority under CERCLA to the President of the United States); Executive Order No. 12580 § 4(d)(1), reprinted in 42 U.S.C. § 9615 (delegating President's authority under § 9622 to EPA Administrator). The Attorney General, too, retains authority to enter settlements resolving CERCLA litigation. 28

U.S.C. § 516 ("Except as otherwise authorized by law, the conduct of litigation in which the United States [or] an agency . . . is a party, or is interested . . . is reserved to officers of the Department of Justice, under the direction of the Attorney General."); Executive Order No. 12580 § 6, reprinted in 42 U.S.C. § 9615 ("The conduct and control of all litigation arising under [CERCLA] shall be the responsibility of the Attorney General."). *Cf. United States v. Hercules, Inc.*, 961 F.2d 796, 798–800 (8th Cir. 1992) (holding that CERCLA Section 122 does not "clearly and unambiguously limit[] the Attorney General's inherent authority [under 28 U.S.C. § 516] . . . to make settlements of [cost recovery] litigation involving the United States").

## 2. Our Review of the Consent Decree is Deferential

The Court begins its review of consent decrees with a healthy dose of "deference to the [agency's] input during . . . negotiations and the law's policy of encouraging settlement." *In re Tutu Water Wells CERCLA Litig.*, 326 F.3d 201, 207 (3d Cir. 2003). While the Court "should not mechanically rubberstamp the agency's suggestions, neither should [it] approach the merits of the contemplated settlement *de novo*." *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir. 1990). Accordingly, this Court's approval is not conditioned on "whether the settlement is one which the court itself might have fashioned, or [even] considers as ideal, but whether the proposed decree is fair, reasonable, and consistent with CERCLA's goals." *Id.*

With regard to fairness, this Court must "assess both procedural and substantive considerations." *In re Tutu*, 326 F.3d at 207. Procedural fairness focuses on the "negotiation process," and requires a close look at its "candor, openness and bargaining balance." *Id.* (quoting *Cannons Eng'g Corp.*, 899 F.2d at 86). Substantive fairness, on the other hand, "requires that the terms of the consent decree are based on 'comparative fault' and apportion liability 'according to rational estimates of the harm each party has caused.'" *Id.* (quoting *United States v. SEPTA*, 235

F.3d 817, 823 (3d Cir. 2000)).  Permitting that the underlying "measure of comparative fault on which the settlement terms are based"—here, the Report as adjusted by the Government during settlement negotiations—"is not arbitrary, capricious, and devoid of a rational basis" the Court should uphold it, regardless of whether it "would have employed the same method of apportionment."  *Id.* (quoting *SEPTA*, 235 F.3d at 824).  Indeed, the Government's method need not even be "the best, or even the fairest, of all conceivable methods . . . particularly when the PRPs involved are numerous and the situation is complex."  *Cannons*, 899 F.2d at 88.  The Court should instead "defer to the Government's expertise in weighing ambiguous and conflicting evidence of substantive fairness."  *United States v. George A. Whiting Paper Co.*, 644 F.3d 368, 373–74 (7th Cir. 2011).

As to reasonableness, a CD meets the mark when it, among other things, advances cleanup efforts, adequately compensates the public for actual and anticipated cleanup costs, and reflects a judicious use of Government resources, accounting for the costs and benefits of expedited settlement versus protracted litigation.  *See, e.g.*, *Cannons*, 899 F.2d at 90; *United States v. Rohm & Haas Co.*, 721 F. Supp. 666, 680 (D.N.J. 1989) (similar).  The "reasonableness inquiry, like that of fairness, is a pragmatic one, not requiring precise calculation."  *United States v. Kramer*, 19 F. Supp. 2d 273, 286–87 (D.N.J. 1998) (quoting *United States v. Charter Int'l Oil Co.*, 83 F.3d 510, 521 (1st Cir. 1996)).  Similarly, a CD furthers CERCLA's statutory purpose when it aligns with "the [Act's] overarching principles: accountability, the desirability of an unsullied environment, and promptness of response activities."  *Cannons*, 899 F.2d at 91; *see also Kramer*, 19 F. Supp. 2d at 289 ("The mandate of CERCLA is to remedy releases of hazardous substances into the human environment by imposing the burdens of remediation and of future risks upon parties liable for causing the harm, consistent with due process."); *B.F. Goodrich v. Betkoski*, 99 F.3d 505, 514 (2d

Cir. 1996) (CERCLA's purposes "include facilitating efficient responses to environmental harm, holding responsible parties liable for the costs of the cleanup, and encouraging settlements that reduce the inefficient expenditure of funds on lengthy litigation." (citations omitted)), *overruled on other grounds by New York v. Nat'l Servs. Indus., Inc.*, 352 F.3d 682 (2d Cir. 2003).

### B. The Instant Consent Decree

With the aforementioned principles in mind, the Court turns to whether the instant consent decree complies with the law. Despite OxyChem's numerous arguments to the contrary, this Court concludes that it does.

### 1. The Consent Decree is Procedurally Sound

Courts look favorably on settlements that are the product of "sophisticated players, with sharply conflicting interests" who have "hammered out an agreement at arm's length and [now] advocate its embodiment in a judicial decree." *In re Tutu*, 326 F.3d at 208–09 (quoting *Cannons*, 899 F.2d at 84). That is precisely the type of agreement produced here. Dozens of PRPs—sophisticated, resourced, and represented by counsel—negotiated over the course of several years, first as a part of the AlterEcho allocation, and then with EPA as part of settlement discussions that resulted in the instant CD. The record indicates those negotiations were both candid and open. *See id.* at 207. PRPs participating in the allocation were not only invited to join in the allocation itself but were encouraged to shape the methodology, the process, and how information was stored. Yeh Decl. ¶ 35. They were also permitted to submit data, expert reports, and briefs to address the liability of themselves and other PRPs, as well as to comment on the draft Allocation Recommendation Report. *Id.* ¶¶ 35–40. EPA, too, submitted over one-hundred thousand pages of documentation obtained from EPA-driven information requests, investigation, enforcement

efforts, and State proceedings. *Id.* ¶ 39. Some of this information was from OxyChem itself, *id.*, despite its failure to participate in the allocation. Settlement negotiations following the allocation spanned approximately eighteen months, *id.* ¶ 57, and were, by all indications, similarly held at arms' length. And, even after the Government and Settling Defendants at long last came to an agreement, *see* ECF No. 2, the Government further solicited public comments on the CD for 90 days, Spohn Decl. ¶ 2, revised the decree based on feedback received in the comments, gained Settling Defendants' approval of the revised CD, and then refiled it with this Court, ECF No. 283.

Despite these robust procedures, OxyChem raises numerous arguments to suggest the CD is procedurally infirm. *See* ECF No. 309 at 13–26. The Court will address them in turn.

### a. The Settling Defendants Have Not Conspired against OxyChem

OxyChem argues that the very allocation framework AlterEcho developed to ensure robust participation and deliberation between participating PRPs incentivized those parties to omit information and conspire against OxyChem, who declined to participate. ECF No. 309 at 23–25. But OxyChem's criticisms are unfounded. It blinks reality to suggest that participating PRPs, sophisticated corporations represented by competent counsel, would lack incentives to minimize their liability in relation to one another, by, for example, ensuring that their adversaries submitted all relevant information and by challenging its accuracy. To the contrary, PRPs were notified from the outset that the allocation's objective was to identify parties eligible to cash out early, *see, e.g.*, Yeh Decl., Ex. C, and any reasonable participant would endeavor to reduce its comparative liability so as to qualify. Indeed, several parties succeeded: EPA settled with parties during the allocation, *id.* ¶ 46, and the allocation assigned "zero shares of responsibility" to five parties "because

AlterEcho did not find a nexus between the parties' facilities and COCs in the river sediments," *id.* ¶ 48.

Beyond incentives arising from the adversarial process, participating PRPs were also required to certify the accuracy and completeness of the information they submitted, ECF No. 289-2 at 68, 76–77, a condition that is embodied in the CD itself, *see* ECF No. 283 ¶ 27 ("Each Settling Defendant certifies individually that . . . it conducted a thorough, good faith search and provided information to AlterEcho consistent with the Allocation Guide that is part of the Final Allocation Recommendation Report, and certified to that effect consistent with the Allocation Guide."); ¶ 14 ("[T]he covenant [not to sue] . . . is conditioned on . . . the veracity and completeness of the information provided to EPA and/or AlterEcho by each Settling Defendant . . . ."). So, contrary to OxyChem's assertions that there are "no meaningful consequences for non-compliance" with AlterEcho's certification requirement, ECF No. 309 at 23 n.49, the consequences would be severe for Settling Defendants.[12]

In short, OxyChem's arguments are unpersuasive, especially considering that OxyChem was invited to participate in the allocation and could have challenged many of these alleged insufficiencies in real time. Instead, OxyChem refused its seat at the table and waited until the

---

[12] OxyChem points to the fact that three parties, Sherwin-Williams, Kearny Smelting, and Conopco, Inc., were removed from the CD after public comment—allegedly for failure to submit relevant information—as evidence that the allocation process "was woefully inadequate to ensure disclosure of all relevant facts," rendering it "fundamentally unfair." ECF 309 No. at 24–25. Sherwin-Williams vehemently opposes OxyChem's allegations and characterization of the record. *See generally* ECF No. 339. Regardless of whether OxyChem's characterization is accurate, this Court remains persuaded of the sufficiency of the procedural safeguards in place, as evidenced by the Government's removal of these parties from the CD. There is no indication that the Government would be unwilling to remove additional Settling Defendants from the CD if it is later discovered that a PRP has breached its obligations under the agreement.

allocation concluded to claim it was treated unfairly. Assuming, *arguendo*, that OxyChem was prejudiced by failing to participate in the allocation, that is a risk it may have reasonably assumed. *Cf. In re Tutu*, 326 F.3d at 206 (reasoning that parties who decline to participate in alternative dispute resolution ought to bear risk of increased liability).[13]

### b. Any Alleged Conflict of Interest Does Not Undermine the CD

OxyChem next claims that AlterEcho had an impermissible conflict of interest because its lead allocator, David Batson, formerly worked as an EPA attorney and, in 2016, was allegedly appointed to serve as an "expert witness" against OxyChem in a legal proceeding. ECF No. 309 at 21–23; ECF No. 292-2; ECF No. 343. The Government disclosed this purported conflict of interest on the docket, ECF No. 292; ECF No. 342, together with information concerning Batson's former EPA employment and his ongoing work as a consultant with AlterEcho for Passaic River cleanup efforts, ECF No. 292-3. The Government also included Batson's "Statements of Work,"

---

[13] For reasons similar to those discussed in the foregoing section, this Court denies OxyChem's request for discovery of "any and all *editing comments*" the Settling Defendants submitted to AlterEcho concerning the Report "to discern how much of the [R]eport was based on Batson's work, rather than the work of self-interested PRPs," ECF No. 343-3 at 21, as well as its request for an "outreach report" that catalogs participating PRPs' "outreach efforts, a description of topics discussed, and a summary of issues or concerns raised," *id.* (quoting ECF No. 309-1 at 307), so that this Court can "discern whether a true allocation occurred" or whether the Settling Defendants "authored" the Report, *id.* This Court will not countenance OxyChem's continued attempts to cast the allocation's procedural safeguards as procedural flaws, absent even a modicum of credible evidence that Settling Defendants held the drafting pen or exerted inappropriate influence on AlterEcho. To do so would unnecessarily burden the parties without any "likely benefit." Fed. R. Civ. P. 26(b)(1); *Wisniewski v. Johns-Manville Corp.*, 812 F.2d 81, 90 (3d Cir. 1987) ("The conduct of discovery is a matter for the discretion of the district court."). *Cf. Democratic Nat'l Comm. v. Republican Nat'l Comm.*, No. 18-1215, 2019 WL 117555, at *3 (3d Cir. Jan. 7, 2019) (concluding that the district court acted within its discretion in denying requests for discovery supported by "no evidence" in the record); *Plastipak Packaging, Inc. v. DePasquale*, 363 F. App'x 188, 192 (3d Cir. 2010) ("[Plaintiff's] proposal to depose [Defendants] in hopes that it will find a legal theory . . . bears all the hallmarks of a fishing expedition, particularly given that there is no evidence" to support Plaintiff's request).

*id.*—normally privileged documents—and an email exchange between the Director of the Ethics Office of the Office of General Counsel for EPA and an Investigator with the EPA Office of Inspector General, discussing the allegations, analyzing the purported conflicts, and concluding that there were none, ECF No. 292-4. Having carefully reviewed all relevant materials, this Court declines to strike down the CD on this basis. Despite OxyChem's arguments to the contrary, the record demonstrates that Batson did not actually serve as an "expert witness" against OxyChem but was retained by the Department of Justice for preliminary work in relation to the allocation. *See* ECF No. 292-3. Further, as OxyChem acknowledges, whether Batson has, in fact, violated any criminal ethics prohibitions is not a question before this Court, ECF No. 309 at 22, and OxyChem's bare assertions that Batson "had prior ties to several settling PRPs," ECF No. 335 at 6; ECF No. 309 at 22 n.47, do not move the needle,[14] *see Barna v. Bd. of Sch. Dirs.*, 877 F.3d 136, 145–46 (3d Cir. 2017) (holding that "ill-developed arguments" supported by "passing and

---

[14] Styled as a request for discovery, ECF No. 343-3, OxyChem adds more color to its otherwise cursory assertions that Batson was unfit to serve as allocator due to his prior work with PRPs, including some Settling Defendants, in 2004, *see id.* at 11–16. Seeing that OxyChem raised this identical concern in its comments to EPA, *see* ECF No. 288-11 at 89–90, it is not apparent why it functionally omitted this argument from its merits briefing. Nonetheless, this Court finds OxyChem's further-developed claims unavailing. OxyChem's reliance on cherry-picked phrases from Batson's testimony in an unrelated matter and language from Batson's resume, both describing his former work as a *neutral*, do not evidence a conflict of interest in this Court's view.

OxyChem also newly elaborates that "it is not disputed that Batson received confidential mediation information" from OxyChem and its indemnitors, who were also members of the 2004 PRP group, which "should have barred Batson from later assigning and allocating liability 'to OxyChem.'" ECF No. 343-3 at 14. But the letter OxyChem cites to in support of that notion makes no mention of Batson, referencing instead another mediator, "Mr. William Hengemihle of FTI Consulting, Inc., who was retained through counsel on behalf of [the 2004 PRP group]." ECF No. 343-3, Ex. 5 at 2. And OxyChem, besides disagreeing with the Report's non-binding recommendations, fails to otherwise explain how the information it may have provided to Batson twenty years ago concerning a distinct phase of work at the Site has rendered the CD before this Court unfair or unreasonable.

conclusory statements" are properly deemed forfeited (cleaned up)), nor does OxyChem's gripe

with AlterEcho's choice to assign it an unfavorable cooperation and culpability score in the

allocation, *see* ECF No. 335 at 6–10.  As to the latter, the Government removed cooperation and

culpability as a factor in calculating Settling Defendants' liability for the CD, to OxyChem's

benefit.  If AlterEcho's assignment of that score was evidence of some conflict of interest, that

conflict is now moot.[15]

### c. The Proposed Settlement Satisfies Section 122

Finally, OxyChem argues that the CD, and the allocation underlying it, failed to comply

with procedural requirements under Section 122 of CERCLA, 42 U.S.C. § 9622, particularly

---

[15] This Court will not grant OxyChem's request for discovery into Batson's purported conflicts of interest and bias.  *See* ECF No. 343 at 2–3.  While OxyChem conspicuously omitted any mention of Batson's conflicts in its communications to EPA expressing concerns about the allocation before it began, *see* ECF No. 309-3, Ex. 27, OxyChem has thoroughly fleshed out its post-hoc allegations in its comments, briefing, record submissions, and other court filings.  The Government has responded in kind.  OxyChem also does not dispute that its counsel has already filed over twenty FOIA requests with EPA and DOJ concerning the CD and AlterEcho allocation, *see* ECF No. 348, to which the Government has likewise replied, *see* ECF No. 309-1, Ex. 1. Dissatisfied with the Government's responses, and unhappy with the Report's non-binding recommendations, OxyChem explores new methods to challenge the CD.  But to allow further proceedings would burden the parties with little "likely benefit," Fed. R. Civ. P. 26(b)(1), particularly considering the volume of information about Batson already exchanged in this matter and the fact that OxyChem has not presented colorable evidence of a conflict, as is required to open discovery in comparable ADR contexts, *cf. Lucent Techs. Inc. v. Tatung Co.*, 379 F.3d 24, 32 (2d Cir. 2004) (refusing to permit post-arbitration award discovery without "clear evidence of impropriety" on behalf of the arbitrator (citation omitted)); *NGC Network Asia, LLC v. PAC Pacific Grp. Int'l, Inc.*, 511 F. App'x 86, 89 (2d Cir. 2013) ("Post-award discovery regarding an arbitrator's alleged bias is appropriate in limited situations where 'clear evidence of impropriety' has been presented." (quotation marks omitted)); *Lyeth v. Chrysler Corp.*, 929 F.2d 891, 899 (2d Cir. 1991) (concluding that the district court did not abuse its discretion in denying request for discovery concerning arbitrator's bias where there was "no evidence" that the arbitrator "had any financial or personal stake in the outcome" and the request was simply "an attempt to determine if there is some basis . . . to prosecute a claim of bias" (citation omitted)); *Merit Ins. Co. v. Leatherby Ins. Co.*, 714 F.2d 673, 683 (7th Cir. 1983) ("We do not want to encourage the losing party to every arbitration to conduct a background investigation of each of the arbitrators in an effort to uncover evidence" of bias, for doing so would "increase the cost and undermine the finality" of the ADR

§ 122(e)(3) (describing procedures for non-binding preliminary allocations of responsibility, or "NBAR"s) and (f) (discussing limitations on covenants not to sue), which requires us to strike down the CD as "procedurally invalid."  ECF No. 309 at 12, 14–21.  In response, the Government, relying primarily on an Eighth Circuit case, *United States v. Hercules, Inc.*, 961 F.2d 796 (8th Cir. 1992), argues that § 122 does not apply to this CD because the provision regulates settlement-types not at issue here and does not otherwise restrict the Attorney General's inherent authority to resolve claims on behalf of the United States.  ECF No. 288-1 at 41; ECF No. 337 at 14 (listing settlements covered in § 122 and stating that the section "does not limit the Attorney General's plenary authority to enter into other types of settlements").

In *Hercules*, the Eighth Circuit addressed a claim similar to the one before this Court.  961 F.2d 796 (8th Cir. 1992).  There, the United States entered into a settlement with PRPs to recover cleanup costs, thereby resolving the PRPs' liability under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).  *Id.* at 798.  Hercules argued that the United States' proposed settlement with PRPs "d[id] not comply with the requirements contained in CERCLA § 122[(a)-(f)]" and that § 122 "limits the authority of the United States, acting through the Attorney General, to settle cases."  *Id.* The Court disagreed, concluding that different provisions of § 122 applied to different settlement

---

proceeding, "contrary to the purpose of the United States Arbitration Act"); *In re Equimed Inc.*, No. 05-1815, 2006 WL 1865011, at *6 (E.D. Pa. June 30, 2006) ("Federal courts have been understandably hesitant to grant extensive discovery in cases alleging arbitrator bias.  In pursuing such an action a disgruntled . . . party can effect prolonged litigation and defeat the very purpose of contracting for arbitration in the first place.").  This Court will not frustrate Congress's intent of encouraging CERCLA settlements to "expedite effective remedial actions and minimize litigation," 42 U.S.C. § 9622(a), by permitting OxyChem, who refused to represent its own interests in the allocation, to continue to impede settlement.  *Cannons*, 899 F.2d at 93–94 (acknowledging that permitting unnecessary proceedings when reviewing a CERCLA settlement undermines the benefits of settlement); *In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 119 (2d Cir. 1992) ("Congress sought through CERCLA to . . . encourage settlements that would reduce the inefficient expenditure of public funds on lengthy litigation.").

types and that because the procedural strictures of § 122(a)–(f) "do not apply to a cost-recovery settlement, those provisions cannot be said to contain any clear and unambiguous limitation on the Attorney General's plenary ability to enter into settlements of cost recovery litigation." *Id.* at 799; *see also id.* at 800 ("CERCLA § 122 does not limit the Attorney General's 28 U.S.C. § 516 based statutory authority to settle cost recovery litigation.").

Underpinning the Court's holding was its broader discussion of the "exclusive authority and plenary power" vested in the Attorney General "to control the conduct of litigation in which the United States is involved"—authority that "includes the power to enter into consent decrees and settlements," *id.* at 798 (citing *Swift & Co. v. United States*, 276 U.S. 311, 331–32 (1928)), and "is not diminished without a clear and unambiguous directive from Congress," *id.* (citing *United States v. California*, 332 U.S. 19, 27 (1947)). Section 122, "an affirmative grant of settlement authority" to the President, *id.* at 800; *see* 42 U.S.C. § 9622(a), as delegated to the agencies, *see, e.g.*, Exec. Order No. 12580 § 4(b)(1), did not "clearly and unambiguously limit the Attorney General's plenary authority over the control and conduct of litigation in which the United States is a party,"[16] *id.* at 799.

While this Court recognizes that CERCLA § 122 is not the picture of clarity, *see, e.g.*, *Cranbury Brick Yard, LLC v. United States*, 943 F.3d 701, 704 (3d Cir. 2019) (noting that

---

[16] The breadth of *Hercules*' holding as to the Attorney General's inherent authority is somewhat unclear. While the Eighth Circuit's analysis focuses primarily on whether specific subsections of § 122 "can[] be said to contain any clear and unambiguous limitation on the Attorney General's" authority to enter into *cost recovery* settlements, 961 F.2d at 799–800, the Court states early on and without reservation that "CERCLA § 122 does not clearly and unambiguously limit the Attorney General's plenary authority over the control and conduct of litigation in which the United States is a party," *id.* at 799. Accordingly, *Hercules* is fairly read to hold that § 122—as a whole—does not restrict the Attorney General's settlement authority. *Cf. United States v. Pesses*, No. 90-654, 1994 WL 741277, at *12 (W.D. Pa. Nov. 7, 1994) (interpreting *Hercules* to "establish[] that the provisions of § 122 are not an express limitation on the Attorney

CERCLA, more generally, "is notorious for its . . . poor draftsmanship" (quotation marks omitted)), it finds the Eighth Circuit's analysis of the provision generally persuasive, particularly as to its structure. This Court, however, need not further discuss the interpretive curiosities of the § 122, the scope of the Attorney General's settlement authority, or whether the CD at bar is in fact covered by § 122, because this Court is satisfied that the CD does not violate the portions of the statute at issue, § 122(e)(3) and § 122(f).

Section 122(e)(3)(A) states that the "President may, after completion of the remedial investigation and feasibility study, provide a nonbinding preliminary allocation of responsibility ["NBAR"] which allocates percentages of the total cost of response among [PRPs] at the facility." Relevant here, an NBAR "shall not be admissible as evidence in any proceeding," *id.* § 9622(e)(3)(C), and the "costs incurred by the President in producing the [NBAR] shall be reimbursed by the [PRPs]," *id.* § 9622(e)(3)(D).

OxyChem, relying primarily on its own say-so, claims that the AlterEcho allocation was an NBAR and that the Government violated the aforementioned procedures where AlterEcho—not EPA—prepared the NBAR, the allocation was submitted as evidence for this Court's review, and PRPs did not reimburse EPA for the costs of the allocation. ECF No. 309 at 14–15. But what OxyChem casts as procedural infirmities are better viewed as indicia that the allocation was not, in fact, an NBAR. As the Government, ECF No. 288-1 at 41–42; ECF No. 337 at 7–10; RS 11, the Settling Defendants, ECF No. 340 at 30–34, and even Nokia, ECF No. 366, explain, the allocation here differed in many ways from the standard NBAR procedures. Among other

---

General's authority to compromise CERCLA claims in general"). This distinction does not alter the Court's analysis because, for reasons discussed below, the CD comports with § 122, and the Government does not take the position that the Attorney General can wholly disregard § 122's procedures. *See* ECF 337 No. at 14, 18.

differences, the allocation was performed by a third-party neutral, not EPA, *cf.* § 9622(e)(3)(A) ("The President may . . . provide a[n NBAR]"); 52 Fed. Reg. 19919–20 (May 28, 1987) ("NBAR Guidance") ("[A]n NBAR is an allocation by EPA . . . ."),[17] and began after EPA completed the RI/FS and issued an ROD for OU2, *cf.* NBAR Guidance ("Should EPA decide to prepare an NBAR, it will normally be prepared during the [RI/FS] and provided to PRPs as soon as practicable, but not later than completion of the RI/FS for the site."). Further, § 122 in no way restricts EPA's discretion to utilize alternative methods to apportion responsibility among PRPs. To the contrary, § 122(e)(3)(A) merely states that the President "may" provide an NBAR, not that he or she is required to. *Cf.* NBAR Guidance (emphasizing that "whether to prepare an NBAR . . . is a decision within EPA's discretion"). Accordingly, because the AlterEcho allocation was not an NBAR, it did not need to abide by the strictures of § 122(e)(3).[18]

OxyChem also contends that the CD violates § 122(f) on two different grounds. ECF No. 309 at 15. Section 122(f) sets forth procedures for covenants not to sue contained in CDs, and, in relevant part, states that "[t]he President may, in his discretion, provide any person with a covenant not to sue concerning any liability to the United States, including future liability, . . . if . . . [t]he covenant not to sue is in the public interest" and "would expedite response action consistent with the National Contingency Plan." *Id.* § 9622(f)(1)(A)–(B). It also states that "[a] covenant not to sue concerning future liability to the United States shall not take effect until the President certifies

---

[17] Available at https://www.epa.gov/sites/default/files/2013-10/documents/non-bind-fr.pdf.

[18] OxyChem rehashes its argument that the AlterEcho Report is an NBAR and, therefore, cannot be relied upon in this proceeding in what it styles as a motion *in limine*. ECF No. 343-1 at 12–15. Finding OxyChem's NBAR-related arguments no more persuasive in that filing, the Court denies that portion of OxyChem's Motion.

that remedial action has been completed in accordance with the requirements of this chapter at the facility that is the subject of such covenant." *Id.* § 9622(f)(3).

But the CD complies with § 122(f)(1) because, as discussed *infra*, *see* Section II.B.3, the CD is both in the public interest and expedites response action. And, keeping in mind this Court's directive to "construe[] [CERCLA] liberally" in furtherance of the Act's purposes, *Alcan*, 964 F.2d at 258—purposes which "include facilitating efficient responses to environmental harm, holding responsible parties liable for the costs of the cleanup, and encouraging settlements that reduce the inefficient expenditure of public funds on lengthy litigation, *Betkoski*, 99 F.3d at 514 (citations omitted)—the Court is also satisfied that the CD does no violence to § 122(f)(3). While the Covenant's Effective Date is technically before the President will have certified that remedial action is complete for OU2 and OU4—indeed, "EPA may yet require a final remedial action for OU4," ECF No. 337 at 25—the CD contains several reservations of rights to the United States to ensure that "defendants meet their legal obligations under the decree and do not leave the cleanup unfinished." *Cf. United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1450–53 (6th Cir. 1991) (CD with covenant not to sue that took effect before all remedial action was completed did not violate § 122(f)(3) where the CD furthered congressional intent and the public interest, contained several reservations of rights to the United States, and where EPA would "continue to clean up the Site using funds provided by the settling defendants").

Here, the Covenant is "conditioned on the satisfactory performance by Settling Defendants of the requirements" of the CD, as well as the "veracity and completeness of the information provided to EPA and/or AlterEcho by each Settling Defendant." ECF No. 283 ¶ 14. It is also subject to several reservations of rights, *id.* ¶ 15, most importantly, a Reopener provision that holds Settling Defendants liable for additional response actions or reimbursement should cleanup costs

for OU2 and OU4 exceed a predetermined amount, double the estimate for the OU2 final and OU4 interim remedies, *id.* ¶ 15(f). It follows that, despite the Covenant's Effective Date, Settling Defendants will not be "off the hook" for future liability[19] until, at the earliest, both the OU2 and OU4 remedies have been completed and EPA has a complete accounting of response costs.[20]

Accordingly, regardless of whether the CD is in fact required to comply with § 122, this Court determines that it does not conflict with the provisions of the statute that OxyChem raises.

### 2. The CD Is Substantively Fair

To satisfy the substantive fairness requirement, the CD's terms must be based on the "comparative fault" of the parties, the measure of which is acceptable so long as it is not "arbitrary,

---

[19] The Court's reasoning on this matter is limited to § 122(f) and the Covenant, and does not extend to whether the Settling Defendants, for the distinguishable purpose of contribution protection, have "resolved [their] liability to the United States." 42 U.S.C. § 9613(f)(2).

[20] There remains the question of who will cover the gap should the OU2 and OU4 remedies exceed the expected costs without crossing the $3.68 billion threshold permitting the United States to initiate further action against Settling Defendants. *See* ECF No. 283 ¶ 15(f). But Settling Defendants have committed to pay significantly more than their estimated share of liability toward cleanup efforts (including paying for a higher-than-currently-estimated cost of the OU4 interim remedy, *see supra* note 6, and paying a 100% premium), which, assuming that EPA's estimates are reliable, *SEPTA*, 235 F.3d at 825 (noting that courts are not "in a position to second guess" EPA's cost estimates that are based on "standard methodologies"), provides EPA with meaningful protection for unexpected cost-overruns, and, ideally, funds to complete any remaining cleanup for OU4 after implementation of the interim remedy. *Cf. United States v. Charter Int'l Oil Co.*, 83 F.3d 510, 522 n.17 (1st Cir. 1996) (acknowledging that payment of a premium helps to mitigate "the risks the government bears out of the uncertainty of the total cost of the remedy"). And the CD, of course, does not preclude EPA from initiating enforcement actions against other PRPs not party to the CD. Indeed, EPA has indicated this CD is just "one part of a larger enforcement effort that includes . . . identifying and pursuing [additional] PRPs for the payment or performance of the cleanup." Yeh Decl. ¶ 60; *see also id.* ¶¶ 64–65 (indicating that EPA has already recovered millions of dollars for cleanup from Site-related enforcement efforts and bankruptcy proceedings). The bottom line is that the Covenant does not leave EPA in the lurch; in addition to the enforcement efforts it has already undertaken, the agency has ample other tools at its disposal to recover funds from PRPs to complete remedial action at both OU2 and OU4, and a Covenant already limited by so many protective reservations should not hinder a settlement that otherwise effectuates

capricious, and devoid of a rational basis." *In re Tutu*, 326 F.3d at 207 (quotation marks omitted). Despite the litany of arguments OxyChem raises in opposition, *see* ECF No. 309 at 27–44, this Court concludes the CD is substantively fair.

OxyChem spills ample ink challenging highly technical aspects of the allocation, largely rehashing arguments it previously raised in its comments. For example, OxyChem claims that (1) the allocation underestimated several PRPs' contributions to the contamination of the LPRSA,[21] *id.* at 29–31; (2) AlterEcho's choice to allocate responsibility based, in part, on each COC's risk to human health and the environment is irrational, *id.* at 32–33; (3) AlterEcho's relative risk calculations "ignore the sizable, independent risk posed by dioxin-like PCBs," *id.* at 33–37; (4) the allocation suffered from various "mathematical and scientific errors," including a unit conversion mistake that impacted the quantity of dioxin attributable to OxyChem and the utilization of an "attenuation factor" that impermissibly decreased other PRPs' liability, *id.* at 38–39; and (5) AlterEcho "drew inconsistent inferences" from the data to the detriment of OxyChem, *id.* at 39–40.

But the Government has adequately and coherently addressed these arguments in its Responsiveness Summary, briefing, and declarations, *cf. Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021) (explaining that traditional arbitrary-and-capricious review under the APA is "deferential" and noting that "[a] court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant

---

CERCLA's remedial purpose and furthers the public interest. *See Alcan*, 964 F.2d at 258; *Akzo Coatings*, 949 F.2d at 1452.

[21] These PRPs responded to OxyChem's arguments and characterization of the allocation. *See* ECF No. 340-8.

issues and reasonably explained the decision"), and this Court is otherwise "poorly suited to evaluate the merits of conflicting [scientific] positions," *George A. Whiting Paper Co.*, 644 F.3d at 373–74. We decline to conduct a trial on the merits and instead "defer to the Governments' expertise in weighing ambiguous and conflicting evidence of substantive fairness," *id.* at 374, as CERCLA contemplates, *United States v. IMC E. Corp.*, 627 F. Supp. 3d 166, 175 n.3 (E.D.N.Y 2022) (explaining that entertaining a "battle of experts is precisely the type of probing judicial inquiry CERCLA was designed to avoid"); *United States v. Davis*, 11 F. Supp. 2d 183, 191–92 (D.R.I. 1998) ("[T]he evidence need not be exhaustive or conclusive in order to determine whether a proposed settlement is substantively fair. . . . Such a requirement would be impractical and would frustrate CERCLA's objective of encouraging early settlement . . . ."); *cf. Akzo Coatings*, 949 F.2d at 1424 (stating that "federal courts have neither the time nor the expertise" to "engag[e] in a de novo review of the scientific evidence"). And, again, OxyChem could have raised these concerns with AlterEcho itself, but it declined to do so.

Further, this Court's review is not limited to the allocation, but also includes adjustments the Government made to the allocation's results for the purposes of settlement. OxyChem concedes that the Government altered some of what OxyChem considers to be "the most egregiously flawed aspects of [AlterEcho's allocation]." ECF No. 309 at 41. Even accepting that the Government's adjustments, however, did not remedy all of the allocation's alleged flaws, *id.* at 41–42, "rational (if necessarily imprecise) estimates of how much harm each PRP has done" suffice under CERCLA, and "[w]hatever formula or scheme EPA advances for measuring comparative fault and allocating liability should be upheld so long as the agency supplies a plausible explanation for it, welding some reasonable linkage between the factors it includes in its formula or scheme and the proportionate shares of the settling PRPs," *Cannons*, 899 F.2d at 87;

*see also IMC E. Corp.*, 627 F. Supp. 3d at 174 ("[M]athematical precision" in apportioning liability is not required under CERCLA).  Here, the Government has provided such "plausible explanation[s]," *Cannons*, 899 F.2d at 87, for the strategic and highly complex choices AlterEcho made during the allocation and the Government's adjustments to it, including, for example, the Government's well-considered choice to extend the CD to OU4.

Only two other of OxyChem's arguments bear mention.  First, OxyChem asserts that the CD is substantively unfair because it is "impossible" for this Court to determine whether the CD reflects a rational estimate of the harm each Settling Defendant has caused where the CD discloses "only the *total* amount that the settling parties *all together* will pay" as part of the joint-and-several-liability scheme embodied in the CD.  ECF No. 309 at 27–28.  But, as the Government correctly notes, *see* ECF No. 337 at 26 n.26, it is not unusual for CD's to disclose only the aggregate settlement amount to be paid by a class of PRPs, *see, e.g.*, *United States v. Davis*, 261 F.3d 1, 25 (1st Cir. 2001) ("[A] consent decree need not specify each [PRP's] degree of culpability.  It is appropriate for classes of PRPs to be assigned aggregate settlement amounts to allocate among themselves."); *United States v. Kramer*, 19 F. Supp. 2d 273, 282–83 (D.N.J. 1998) (same and collecting cases),[22] and, in any event, this Court can discern from the record approximately how much each Settling Defendant may expect to pay under the CD based on "estimates of the harm each party has caused," *SEPTA*, 235 F.3d at 823.  *See, e.g.*, ECF No. 309-16 (OxyChem's table listing each Settling Defendant's relative share of culpability using EPA's adjusted calculations);

---

[22] OxyChem, ignoring relevant precedent in this jurisdiction and mischaracterizing other authorities, *see* D.N.J. Loc. R. App'x R at R5 (Lawyers "will not knowingly misrepresent [or] mischaracterize . . . authorities in any . . . written communication to the court"), asks this Court to grant its proposed request for "[d]isclosure of the amount being paid by each settling party," ECF No. 343-3 at 18–19.  This information is irrelevant to the Court's limited inquiry, so OxyChem's request is denied.

ECF No. 337-1 (Tables listing each Settling Defendants' share under Protocol and Alternative method calculations).[23]

Second, OxyChem argues that the CD's provision offering Settling Defendants protection from non-settlors' contribution claims is "unfair," contrary to law, and even amounts to an unconstitutional taking. ECF No. 309 at 43–44. OxyChem's arguments are foreclosed by ample judicial precedent, *see, e.g.*, *SEPTA*, 235 F.3d at 822–23 (affirming District Court's determination that settlors were protected from non-settlors contribution claims); *Cannons*, 899 F.2d at 92 ("Congress plainly intended to non-settlors to have no contribution rights against settlors regarding matters addressed in settlement."); *Davis*, 261 F.3d at 28 ("As to the extinguished contribution claims of non-settlors or later round settlors, protection against those claims was a reasonable benefit the settlor acquired in exchange before settling before those others." (cleaned up)); *United States v. BP Amoco Oil PLC*, 277 F.3d 1012, 1017–18 (8th Cir. 2002) (concluding that contribution protection did not constitute an unconstitutional taking), the cases OxyChem's cites in support are readily distinguishable, and this Court otherwise declines to invalidate the CD on constitutional grounds where OxyChem fails to meaningfully discuss the Government's cited authority, *cf. Davis*,

---

[23] In this vein, OxyChem contends that the fact the settlement amount remained the same after three parties were removed underscores the fact that the settlement "is not based on rational estimates of the actual harm each settling party caused." ECF No. 309 at 28. But early settlement comes with a price, and Settling Defendants, understandably, were willing to pay more in exchange for the protections outlined in the CD. *See* ECF No. 340 at 27–28 ([T]he maintenance of the settlement amount despite the removal of three parties was due to Settling Defendants' reluctant willingness to account for the difference to minimize further negotiations and avoid litigation."). This does not change each party's relative responsibility, nor does it undermine the substantive fairness of the settlement. *Cf. Cannons*, 899 F.2d at 88 (recognizing that the benefits associated with early settlement, among other considerations, may appropriately factor into the settlement figure).

261 F.3d at 28 (declining to consider underdeveloped takings argument in relation to contribution protection).

Accordingly, this Court finds the CD substantively fair.

### 3.  The CD is Reasonable and Furthers CERCLA's Goals

In addition to being fair, a CD resolving CERCLA liability must be reasonable and further the Act's goals.  This CD satisfies both requirements.  It is reasonable because it extracts $150 million from Settling Parties—a sum significantly more than their estimated liability for the decided upon remedial action—that will be immediately available for cleanup efforts.  *See City of New York v. Exxon Corp.*, 697 F. Supp. 677, 693 (S.D.N.Y. 1988) (describing payment to be used for cleanup efforts as an "immediate public benefit").  It also contains ample reservations of rights to ensure the public is "satisfactorily compensate[d] . . . for the actual (and anticipated) costs of remedial and response measures."  *Cannons*, 899 F.2d at 90.  Further, the settlement, by resolving 82 PRPs' liability without protracted litigation, preserves the Government's enforcement resources and clears the way for EPA to focus on cleanup and more culpable offenders.  *Cf. Kramer*, 19 F. Supp. 2d at 289 ("By simplifying the remaining litigation . . . the public and the parties benefit from the 'saving of time and money that results from the voluntary settlement of litigation.  Likewise, the savings of governmental litigation resources of experienced counsel and staff may now instead be devoted to other pressing cases where litigation is necessary." (citation and quotation marks omitted)).

For many of the same reasons, the CD furthers CERCLA's goals.  *See id.* at 289; *Betkoski*, 99 F.3d at 514.  Though it does not recoup all costs for remediation of OU2 and OU4, it holds Settling Defendants accountable for more than their fair share of liability and serves as an

important step in EPA's full sequence of enforcement actions.[24]  *See, e.g.*, RS 1 (stating that "the $150 million payment in the proposed Decree is not the first and will not be the last or final payment by responsible parties for cleanup of the Passaic River" and explaining that the allocation was "sponsored as part of [EPAs] overall enforcement strategy for the Site"); RS 2 (noting that parties not included in the settlement "are not escaping liability.  EPA expects to pursue more settlements, litigation, or issue orders to ensure that remaining PRPs pay their share or perform cleanup work."); Yeh Decl. ¶ 60 (same).

### 4.  Other Arguments Raised in OxyChem's Self-Styled Motion *in Limine*

In addition to those arguments already addressed above, OxyChem, in what seems to be an attempt to both circumvent this Court's page limit restrictions and to preserve arguments it failed to include in its merits briefing, raises several additional reasons for why this Court "cannot approve the proposed settlement," ECF No. 343 at 2, in what it styles as a motion *in limine*, ECF No. 343-1.[25]  *See* ECF Nos. 309 at 19 (raising CERCLA § 122(e)(3) as a basis to disregard the Report but omitting any meaningful discussion of EPA's purported violations of the Alternative

---

[24] OxyChem also argues that by extinguishing OxyChem's contribution claims against Settling Defendants, the CD disincentivizes PRPs from undertaking voluntary cleanup, thus, contravening CERCLA's goals.  ECF No. 309 at 46–47.  This claim is merely an extension of OxyChem's earlier-addressed contribution arguments.  *See, e.g.*, Section II.B.2.  While encouraging voluntary cleanups may further CERCLA's policies, *see Comm'r of Dep't of Plan. & Nat. Res. v. Century Alumina Co.*, 2005/062, 2007/114, 2008 WL 4693550, at *1 (D.V.I. Oct. 22, 2008), CERCLA also undisputedly encourages early settlement and the protections that come therewith, like contribution protection.  *Cannons*, 899 F.2d at 91–92.  As a result of that protection, PRPs who fail to resolve their liability early "risk [] bearing a disproportionate amount of liability." *Id.* at 91.  But "that is not to say that the device is forbidden.  To the exact contrary, Congress has made its will explicit and the courts must defer.  *Id.*  This Court abides by CERCLA's directive.

[25] OxyChem also filed a second motion *in limine* asking this Court to exclude as untimely six expert declarations filed with the Settling Parties' responsive briefing.  *See* ECF No. 343-2.  As the Court was able to resolve this dispute without reference to or reliance on those declarations, OxyChem's motion is moot.

Dispute Resolution ("ADR") Act as a separate basis to disregard it), 335 at 4 (same). As an initial matter, the Court notes that "a motion *in limine* is designed to narrow the evidentiary issues *for trial* and to eliminate unnecessary *trial interruptions*," *Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1069 (3d Cir. 1990) (emphasis added), not to refine or rehash substantive claims, *see, e.g.*, *Laskowski v. Dep't of Veteran Affs.*, No. 3:10-cv-600, 2011 WL 5040953, at *4 (M.D. Pa. Oct. 24, 2011); *Festa v. Flowers*, No. 17-5327, 2022 WL 2235864, at *3 (D.N.J. June 22, 2022), raised during the course of a summary proceeding. The Court, however, will address OxyChem's arguments in furtherance of judicial economy. They lack merit.

OxyChem primarily contends that we "cannot approve the proposed settlement," ECF No. 343 at 2, because EPA violated the ADR Act "[s]everal [t]imes [over]," ECF No. 343-1 at 18. These alleged violations, according to OxyChem, also prohibit the Court from considering the Report. *Id.* at 18–25.

First, OxyChem asserts that § 572(a) of the ADR Act only permits an agency to use a dispute resolution proceeding[26] "if the parties agree to such proceeding." ECF No. 343-1 at 19 (quoting 5 U.S.C. § 572(a)). And "[w]ithout the consent of or voluntary participation by OxyChem," "that process and its results violate the ADR Act." *Id.* But OxyChem was not a party to the AlterEcho proceeding,[27] so EPA did not need its consent. And OxyChem points to no

---

[26] A "dispute resolution proceeding" under the ADR Act "means any process in which an alternative means of dispute resolution is used to resolve an issue in controversy in which a neutral is appointed and specified parties participate." 5 U.S.C. § 571(6).

[27] A "party" under the ADR act means "for a proceeding with named parties, the same as in section 551(3) of this title[,] and for a proceeding without named parties, a person who will be significantly affected by the decision in the proceeding and who participates in the proceeding." 5 U.S.C. § 571(10). 5 U.S.C. § 551(3), in turn, defines party as "a person or agency named or admitted as a party, or properly seeking and entitled as of right to be admitted as a party, in an agency proceeding, and a person or agency admitted by an agency as a party for limited purposes."

authority indicating that a holdout becomes a "party" under the ADR Act simply because the proceeding implicates the holdout's interests. To the contrary, the ADR Act specifically contemplates, and permits, ADR proceedings that "affect[] persons or organizations who are not parties to the proceedings," even "significantly" so. *Id.* § 572(b)(4).

Second, OxyChem argues that § 574 of the ADR Act "bars any use" of the Report, a "dispute resolution communication,"[28] because OxyChem "never consented to it."[29] ECF No. 343-1 at 23–24. But § 574's prohibition only protects parties and nonparty participants.[30] OxyChem is neither.[31] *See* ECF No 343-3 at 25 (describing EPA as a nonparty participant).

Third, OxyChem claims that Batson was not a "neutral" under the ADR Act—another reason why "EPA violated" the law and why the "Report cannot be used for any purpose." ECF

---

[28] A "dispute resolution communication" is defined as "any oral or written communication prepared for the purposes of a dispute resolution proceeding, including any memoranda, notes or work product of the neutral, parties or nonparty participant." 5 U.S.C. § 571(5).

[29] OxyChem also claims that David Batson is purportedly "subject to a preexisting confidentiality agreement—governed by the ADR Act—related to his earlier work on [a 2004 Diamond Alkali Superfund Site allocation]." ECF No. 343-1 at 23–24. And "OxyChem was not asked to waive—and it never waived—the confidentiality obligations that governed that allocation." *Id.* If that is true, OxyChem is free to pursue legal action against Batson for breaching that agreement in a separate proceeding.

[30] The ADR Act prohibits a neutral's disclosure of dispute resolution communications when the *parties* to the dispute resolution proceeding have not consented in writing, or, if the communication was provided by a "nonparty participant," the *nonparty participant* has not consented in writing. *See* 5 U.S.C. § 574(a)(1). Likewise, *parties* to the dispute resolution proceeding cannot disclose communications unless, among other things, that communication "was prepared by the party seeking disclosure," or "all parties to the dispute resolution proceeding consent in writing." *Id.* § 574(b)(1)–(2).

[31] Separately, the Court acknowledges an additional exception to confidentiality in the ADR Act: "[A] neutral in a dispute resolution proceeding shall not . . . disclose . . . any dispute resolution communication . . . unless . . . a court determines that such . . . disclosure is necessary to . . . prevent harm to the public health or safety, of sufficient magnitude in the particular case to outweigh the integrity of dispute resolution proceedings in general by reducing the confidence of parties in future cases that their communications will remain confidential." 5 U.S.C. § 574(a)(4)(C). Even

No. 343-1 at 19–22.  OxyChem largely rehashes unsupported allegations of bias that this Court has already rejected.  *Id.*  Finding, based on the record, that Batson had no colorable "official, financial, or personal conflict[s] of interest with respect to the [AlterEcho allocation]," 5 U.S.C. § 573(a), this Court declines to reject the CD on this basis.  And, to the extent OxyChem contends that Batson's purported work as an expert witness against OxyChem exposes him to False Claims Act liability, OxyChem is free to pursue its theories in a separate action.

Finally, OxyChem raises two additional arguments as to why the Court "cannot approve the proposed settlement," ECF No. 343 at 2, again predicated on the Report.  First, OxyChem claims our consideration of the Report, an alleged "settlement communication," is barred by Federal Rule of Evidence 408, which prohibits the Government "from offering it in evidence to prove the liability of . . . OxyChem."  ECF No. 343-1 at 27 ("EPA and defendants . . . offer the Batson Report as evidence of OxyChem's alleged liability and of their own alleged comparative fault, in hopes that the Court will rely on it to enter a judgment extinguishing OxyChem's contribution claims.").  But the Court here is not ruling on OxyChem's liability.  The purpose of this limited, summary proceeding—in which OxyChem is merely an intervenor—is to determine whether the CD, not the Report, is "fair, reasonable, and consistent with CERCLA's goals."  *In re Tutu*, 326 F.3d at 207.  The CD does not constitute an admission of liability as to the Settling Defendants, *see* ECF No. 283 at 7 ("the Settling Defendants entering into this Consent Decree do not admit any liability to [the Government] with respect to OU2 or OU4 of the Site"), nor does it establish OxyChem's liability to the Government.  Indeed, it will indirectly extinguish OxyChem's contribution claims against the Settling Defendants (only for the "matters addressed" therein), *id.*

---

if OxyChem was a party to the AlterEcho allocation and could ask this Court "to preclude any party from relying on the [R]eport for any purpose here," ECF No. 343-1 at 24, the Court, based on the nature of this proceeding and the record before it, would find the exception easily met.

at 15, but it does not affix any set percentage of liability to OxyChem or prevent it from recouping costs from other PRPs.  Likewise, the Report, which contains non-binding recommendations that the Government ultimately revised for settlement, merely informed this Court's analysis of the CD and is not being offered against OxyChem to prove its liability, or "the validity or amount of a disputed claim."  Fed. R. Evid. 408(a).  And there is nothing in Rule 408 preventing this Court from considering the Report "for another purpose."  *Id.* 408(b).

OxyChem also claims the Report, in violation of Federal Rule of Evidence 801, is an "out-of-court statement (by Batson) that the government seeks to offer for the truth of the matter asserted . . . namely, the parties' relative shares of liability for response costs."  ECF No. 343-1 at 28.  For reasons already discussed at length, the non-binding Report is not being offered as truth of the parties' liability for response costs in this proceeding.  *Cf. Cannons*, 899 F.2d at 87 (noting that a CD's terms must only be "roughly correlated with[] some acceptable measure of comparative fault, apportioning liability among the settling parties according to rational (if necessarily imprecise)" estimates of harm).

### C.  The Remaining Intervenors: PVSC, Sherwin Williams, Nokia, and Pharmacia

The remaining Intervenors' briefing merits little discussion.  PVSC, ECF No. 306, and Sherwin-Williams, ECF No. 339, do not oppose the CD's entry, but have intervened in support or to clarify the record, respectively.

Nokia objects to the Government's choice to exclude it from the CD as a Tier 2 party, arguing that, but for some of AlterEcho's scientific inputs, it would have landed in Tier 3, ECF No. 307 at 18 ("[T]he United States's exclusion of Nokia from the Proposed CD is both arbitrary and irrational."), while at the same time rejecting the very foundation of the CD—the usage of

44

AlterEcho's Alternative Method and the Government's adjustments to that method for settlement, *id.* at 22–28 (challenging Alternative Method's distribution of the orphan share), *id.* at 28–31 (criticizing Government's removal of culpability and cooperation findings).   Recall, the Government's use of the Alternative Method rather than the Protocol Method and revisions to the allocation's results together increased Nokia's liability.   Yeh Decl. ¶ 57.   In short, it seems Nokia would have liked to settle with the Government, but using the calculations and methodology that minimized its liability in relation to the other PRPs.

Pharmacia makes nearly identical arguments as Nokia, taking issue with certain AlterEcho calculations that increased its liability in comparison to other PRPs, ECF No. 308 at 9–15, and criticizing the Government's utilization of AlterEcho's Alternative Method, *id.* at 16–17, 19–26, as well as its choice to exclude the cooperation and culpability factor for settlement, *id.* at 26–36. Throughout, Pharmacia casts the results of the non-binding allocation, specifically those derived from the Protocol Method, as binding on the United States and participating PRPs, *id.* at 1 ("[T]he United States is not abiding by the agreements it made with parties during the allocation."); *id.* at 37 ("The *agreed-upon* Protocol Methodology assigned Pharmacia a share of 0.0157 percent . . . ." (emphasis added)), and indicates a willingness to settle with the Government utilizing that method.

While Nokia and Pharmacia may disagree with some of AlterEcho's and the Government's choices and, understandably, desire to resolve their liability for the LPRSA as soon as possible, this Court finds no basis to reject the CD on these grounds.   Indeed, the CD must be fair to non-settlors.   *See Kramer*, 19 F. Supp. 2d at 285.   But fairness does not require inclusion in the settlement.   *See, e.g.*, *Cannons*, 899 F.2d at 93 ("CERCLA . . . do[es] not require the agency to open all settlement offers to all PRPs . . . . [T]he right to draw fine lines, and to structure the order and pace of settlement negotiations to suit, is an agency prerogative."); *City of Bangor v. Citizens*

*Commc'ns. Co.*, 532 F.3d 70, 96 (1st Cir. 2008) ("The EPA itself, when the United States institutes a CERCLA action, does not need to open settlement offers to all PRPs"); *United States v. Doe Run Res. Corp.*, No. 15-0663, 2017 WL 4270526, at *6 (N.D. Okla. Sept. 26, 2017) ("CERCLA does not require the EPA to permit all PRPs to participate in settlement negotiations, and the EPA is free to negotiate and settle with whomever it chooses as long as the EPA acts in good faith."); *United States v. Grand Rapids, Mich.*, 166 F. Supp. 2d 1213, 1221 (W.D. Mich. 2000) (same).

Nor does it require adoption of a PRP's preferred methodology; as with OxyChem's highly technical challenges to the allocation and the Government's adjustments to it, this Court "defer[s] to [its] expertise in weighing ambiguous and conflicting evidence of substantive fairness." *George A. Whiting Paper Co.*, 644 F.3d at 373–74. Again, the Government's method of apportionment need not be "the best, or even the fairest, of all conceivable methods," and, in light of its "considerable flexibility in negotiating and structuring settlements" to resolve CERCLA liability, the Government should be permitted "to depart from rigid adherence to formulae wherever the agency proffers a reasonable good-faith justification for departure." *Cannons*, 899 F.2d at 88. Here, the Government has adequately explained both its scientific and strategic decisions, including its departure from certain of the allocation's recommendations, which were never binding on the Government and only intended to be used as a "factor" in future settlements. *See* ECF No. 289-2 at 69 ("[N]either the EPA nor the Allocation Parties are bound by the results of the Allocation . . . .").

While Nokia and Pharmacia may not have been included in this round of the Government's multi-phased settlement process, the Government included Nokia and Pharmacia in the allocation process, *see, e.g.*, ECF No. 289-1, has had discussions with the companies as Tier 2 parties, ECF Nos. 334-1, 334-2, and "plans to negotiate with them in the future," ECF No. 334 at 2. The record

indicates the CD is fair, reasonable, and in alignment with CERCLA's goals, and this Court will not otherwise interfere with the Government's authority to draw the difficult but well-considered "fine lines" between PRPs in furtherance of cleanup. *Cannons*, 899 F.2d at 93.

### III.     Conclusion

As OxyChem acknowledges in its opposition briefing, "[p]ollution of the Passaic River dates back to the industrial revolution." ECF No. 309 at 4. EPA, for its part, has been working to clean up the LPRSA for four decades. Fish and wildlife, the environment, and the citizens of this State have suffered long enough because of corporations' self-interested and deplorable waste disposal practices. This CD constitutes an important next step in holding these companies accountable for their acts and will further cleanup of the LPRSA. The Court enters it without further delay.

Date: December 18, 2024

*s/ Madeline Cox Arleo*
**Hon. Madeline Cox Arleo**
**UNITED STATES DISTRICT JUDGE**